Donald and Lena HUDSON,
Respondents,

v.

SNYDER BODY, INC., Appellant (51670),

Perfection Cobey Co., Appellant (51752),

Potomac Ford Truck Sales, third party
defendant, Respondent,

Jack L. Olsen, Inc., third party
defendant, Respondent.

Nos. 51670, 51752.

Supreme Court of Minnesota.

Aug. 31, 1982.

Rehearing Denied Nov. 29, 1982.

Hanft, Fride, O'Brien & Harries and Gaylord W. Swelbar, Duluth, for Snyder Body, Inc.

Johnson, Fredin, Killen, Thibodeau & Seiler, John J. Killen and Nicholas Ostapenko, Duluth, for Perfection Cobey Co.

Halverson, Watters, Bye, Downs & Maki and Don L. Bye, Duluth, for Hudson.

Donovan, McCarthy, Crassweller, Larson & Magie and Robert H. Magie III, Duluth, for Potomac Ford Truck Sales.

Mathias & Brown and Mark L. Knutson, Duluth, for Jack L. Olsen, Inc.

WAHL, Justice.

This action is based on claims arising from an accident in which respondent Donald Hudson was injured when the box of a dump truck dropped on his shoulder. Hudson and his wife, Lena Hudson, brought their claim in negligence and strict liability against Perfection-Cobey Company (Perfection), the manufacturer of the hoist that raised the box of the truck; Potomac Ford Truck Sales, Inc. (Potomac), the dealer that supplied the chassis on which the box was mounted; and Snyder, the company that assembled the truck. Perfection brought a third-party action for indemnity and contribution against Hudson's employer, Jack L. Olsen, Inc. (Olsen). The trial court, St. Louis County District Court, entered judgment pursuant to a jury verdict in Hudson's favor. Snyder, Perfection and Potomac appeal from that judgment. We affirm in part and reverse in part.

On October 28, 1974, Hudson began working for Olsen as a dump truck driver on a road-building project in Taconite Harbor, Minnesota. He made seven or eight round trips from a gravel pit to the dump site on his first day of work and then was injured on the second day while trying to empty his fourth or fifth load for that day.

Hudson was driving a brand new dump truck which Olsen had purchased from Potomac. Snyder had installed the box of the truck which it had manufactured according to Perfection's design. Perfection manufactured the hoist which Snyder then mounted on the box. After installing the box and mounting the hoist, Snyder returned the truck to Potomac, where Olsen picked it up on October 23, 1974. The truck was then driven from Maryland to Minnesota, where it was turned over to Hudson on October 26, 1974.

In order to examine the basis for Hudson's claims, it is necessary to understand the operation of the truck's tailgate and hoist as explained by witnesses at trial. The "dump lever," which is on the front end of the box, is connected by a series of shafts and cams to two hooks that keep the tailgate closed. When the lever is pulled, the shafts are rotated; this rotation in turn raises a hook on either side of the tailgate and opens the gate. Perfection manufactured the parts for this release mechanism, and Snyder followed Perfection's design in installing the mechanism on the box.

A critical component of the release assembly is a cam, located on the underside of

the box, which consists of an arm and a shaft. The dump lever is connected to a shaft which, when the lever is pulled, moves an arm which is welded to a horizontal shaft. When the horizontal shaft rotates, it moves two shafts that are connected to the tailgate.

The driver activates the hoist from inside the cab. When he puts the hoist lever in the "up" position and accelerates the engine of the truck, a hydraulic pump forces oil into the hoist cylinder under pressure. The oil causes the telescoping hoist to extend, one sleeve at a time. First the larger sleeve extends, then the one just inside that, and so on until the box is at its full height or the operator stops its rise.

Hudson testified that he followed his usual procedure when trying to dump the load that caused him trouble. He activated the hoist mechanism and, while the box was in motion, tried to pull the dump lever. However, the lever did not work, despite the fact that he pulled hard on it. Hudson next put the hoist on "hold" in order to stop the box from rising any further, then tried to lower the box by putting the hoist lever in the down position. When the box would not come down, he put the hoist control on "hold" again and left the cab of the truck. He stepped up on the battery box, hoping to reach the tailgate lever, and was reaching up with his left arm when the box came down and hit him on the shoulder.

Lee Sapetta, a mechanical engineer, testified as an expert witness on the Hudsons' behalf. Sapetta inspected the truck in the spring of 1975 and took several pictures, which were admitted as plaintiffs' exhibits. The crux of Sapetta's testimony was that the cam was defective in that the end of the arm that extended beyond the shaft was superfluous and that there was not enough clearance between the end and the underside of the box. When Sapetta examined the box, he noticed that its floor was severely dented from the impact of large rocks. He stated that the denting had interfered with the operation of the arm of the linkage assembly to the extent that the arm had worn a groove in the floor of the box. Since the arm extension was superfluous to the operation of the cam, Sapetta testified that this was a defect in the design of the dumping mechanism. James Snyder, of Snyder Body, agreed that the extension served no useful purpose and that Snyder could have changed Perfection's design of the arm.

Sapetta also testified that the drop of the dump box was caused by excessive air in the hydraulic system, excessive binding or friction in the linkage assembly, and/or a failure of the hoist components to go up in the proper sequence. However, when Sapetta examined the truck, he found no evidence of either excessive friction, leaking oil, or sticking and binding of the components of the hoist.

Roland Kennedy, Perfection's project manager of hydraulics, and Clare Cleland, a Perfection vice-president, testified to their opinion that the drop of the box was caused by a pullout of the telescopic hoist. A pullout occurs when the load pulls the cylinder up instead of oil pumping the cylinder out. Pullout, which is a rare phenomenon, happens only when the angle of the box combines with a shift in the center of gravity to produce enough force to pull out the telescopic hoist.

Kennedy also testified that Perfection tests each front mounting telescopic hoist by running it up and down before it leaves Perfection's plant. Snyder testified that Snyder Body tests both the hydraulic unit and the tailgate release mechanism before delivering a truck to its purchaser. Lee Linger, of Potomac, stated that Potomac inspected the chassis before it went to Snyder for installation of the box and hoist. After Snyder returned the truck, Potomac checked to see that it was built to specification and that the hoist was operating properly. Jacob Lepak, an employee of Olsen, inspected the truck when it arrived in Duluth; he said the tailgate release mechanism was within normal range and that the hoist performed properly at that time.

Although Hudson had been in Olsen's employ only a day and a half before his accident and had never operated a truck with a

full load, he was somewhat familiar with the operation of a dump truck because he had formerly been employed to install dump boxes and to service trucks. Walter Celusta, another of Olsen's employees, instructed Hudson on the operation of the truck on the Saturday before Hudson went up to Taconite Harbor. During that 1½ hour instruction time, Hudson drove the truck around Duluth and operated the hoist and the dump release mechanism. Both on that day and on the first day of the job, Hudson noticed that the dump lever was stiff and difficult to operate. On one occasion he got out of the truck cab in order to use both hands to pull the lever down. He had no trouble with the hoist at that time.

LeRoy Sipes, another truck driver employed by Olsen, was the first person to drive the truck after the box came down on Hudson's shoulder. He arrived at the dump site after the accident and tried to raise or lower the box. Sipes testified that he was unable to move the box up or down because of the slope the truck was on but that he then drove the truck forward to level ground and operated both the hoist and the dump release mechanism without difficulty. Sipes then used the truck for a couple of days after the accident and had no problems with it.

Robert Sippo, another of Olsen's drivers, had no difficulty with either the hoist or the dump release mechanism during the 5-year period after the accident when he was driving Hudson's truck. Sippo, who had 24 years of truck-driving experience, testified that the two devices worked in the same manner as similar mechanisms on numerous other dump trucks he had driven. Sippo also serviced the truck some 2 or 3 weeks after the accident. He examined the tailgate release mechanism at that time and found no denting in the area of the cam. He said there was no interference with the free operation of the release mechanism.

The court heard testimony from three employees of Erie Mining Company who had been working in the vicinity of the accident when the box dropped on Hudson's shoulder. Del Furgason, who was about 50 feet from the truck, stated that the box was raised to its full height and that Hudson was standing in back of the cab reaching for a rope that was attached to the dump lever when the box dropped and hit him on the shoulder. The testimony of Steven Peterson and James Schmidt, the other Erie workers, agreed in its essentials with that of Furgason, although they were less sure that a rope had been hanging from the lever. Hudson testified that there was no rope attached to the lever.

The court also heard much testimony regarding whether Perfection and/or Snyder had adequately instructed the user about the operation of the truck and provided proper warnings about its dangers. There were no warnings affixed to the inside of the cab in the area of the controls, nor had Hudson, Olsen, or any of the employees seen an instruction guide. Snyder testified that a user's manual was put in the glove compartment of each truck before it left Snyder's shop. Linger testified that Snyder usually placed a user's manual in the glove compartment of each vehicle and that it was not Potomac's responsibility to check for a manual. Hudson stated that he had not looked for a manual in the glove compartment.

Two additional factors which may have affected the functioning of the tailgate release mechanism were the slope of the dump site and the fact that Hudson was trying to open the gate while the load was rising. Although several witnesses testified that the 3% or 2° slope of the site contributed to the instability of the load and its eventual fall, Celusta testified that such a slope was minimal, and Sippo said it was common to dump on such terrain.

There was conflicting testimony regarding the fact that Hudson was trying to raise the load and open the gate at the same time. Snyder stated, "The tailgate should be tripped before you start, period." However, Sippo testified that it is common, especially when spreading gravel, to open the gate while the hoist is rising, and Celusta said that a driver should be able to open the gate when the hoist is up.

The trial court submitted the case to the jury on a special verdict, asking the jury to determine the claims of strict liability and negligence with respect to each defendant. The court also asked the jury this question: "Taking all of the faults which contributed as a direct cause to the injury to be 100%, what percentage or proportion thereof do you attribute to [each of the defendants]?"

The jury found each defendant liable to the Hudsons on theories of both negligence and strict liability. They awarded Donald Hudson $360,000 and Lena Hudson $25,000, apportioned as follows: Snyder, 35%; Perfection, 25%; Potomac, 0%; Olsen, 20%; Hudson 20%. The court then subtracted Hudson's 20% from the jury award and ordered judgment against defendants in the amount of $308,000: $288,000 for Donald Hudson and $20,000 for Lena Hudson.

We must determine five issues on appeal: (1) Did the trial court err in allowing Sapetta to testify as an expert witness for the Hudsons? (2) Does the evidence support the jury's findings of strict liability against Snyder, Perfection and Potomac? (3) Were the jury's answers to special interrogatories so perverse as to require a new trial? (4) Was the evidence sufficient to support the jury verdict that Olsen was causally negligent? (5) Did the trial court err in failing to enter judgment for contribution against third-party defendant Olsen?

1. The trial court admitted the testimony of Hudson's expert, Sapetta, to explain the mechanics of the truck and describe how the accident probably occurred. Appellants argue that the court should not have allowed Sapetta's testimony because he did not examine the truck until 6 months after the accident.

We have often held that "the admissibility of expert testimony rests within the sound discretion of the trial court, and * * [we will not reverse its decision] on appeal unless there is a showing of clear abuse of discretion." *Dunshee v. Douglas,* 255 N.W.2d 42, 47 (Minn.1977). We have allowed the testimony of an expert who did not investigate the scene of an accident until 3 years after the accident when there

was no evidence that the highway had changed between the day of the accident and the day of the investigation. *Bohach v. Thompson,* 307 Minn. 332, 239 N.W.2d 764 (1976).

■ Sapetta's testimony focused on two matters: the sticking of the tailgate and the dropping of the box. The crux of his testimony on the tailgate lever was that a design defect in the cam had caused the tailgate to stick. His testimony on the dropping of the box was less conclusive. In Sapetta's view, the hoist could have fallen for one or more of three reasons: because there was air in the system, because the seals were not adjusted properly, or because the cylinders of the hoist did not go out in proper sequence. In view of the fact that appellants have not presented evidence that the mechanics of either the cam or the hoist had changed during the intervening 6 months, Sapetta's testimony on the functioning of the truck should be allowed.

■ Sapetta also testified that, on the day he examined the truck, he noted a groove in the bed of the box just where the arm extension would have hit it. The groove itself is circumstantial evidence offered not to show the condition of the truck at the time of the accident but to support Hudson's theory that the binding of the shaft caused the failure of the tailgate to open. Under this theory a groove would not necessarily have been made the first few times the arm extension hit the box. The evidence is relevant, and thus admissible. Minn.R.Evid. 401, 402.

The trial court then allowed Sapetta to testify to his opinion of what had caused the accident. Sapetta concluded from the length of the arm and the groove in the box that a defect in the design of the cam had caused the tailgate not to open. Appellants argue that the trial court should not have permitted Sapetta to testify to his opinion of what caused the accident, because he was merely speculating.

■ The function of the expert is "to assist the jury in reaching a correct conclusion from the facts in evidence." *Albert*

*Lea Ice & Fuel Co. v. United States Fire Insurance Co.,* 239 Minn. 198, 202, 58 N.W.2d 614, 617 (1953) (citations omitted). The expert must base his opinion on facts sufficient to form an adequate foundation for an opinion and should not be allowed to speculate. *Id.* at 203, 58 N.W.2d at 618. Since Sapetta based his opinion on facts in evidence, and since his opinion could assist the jury in drawing a conclusion from those facts, we find that the trial court did not abuse its discretion in admitting Sapetta's testimony.

■ 2. We next examine the jury's finding that Snyder, Perfection and Potomac are all strictly liable, viewing, as we must, the evidence in the light most favorable to Hudson, the prevailing party. *Steumpges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256 (Minn.1980). We will overturn a jury verdict only when it is manifestly contrary to the evidence, and we limit our review even further because the jury has considered the demeanor of the witnesses. *Id.*

■ Plaintiffs must establish each of the following elements in order to recover on a theory of strict liability: (1) that plaintiff was injured, (2) that the injury was caused by defendant's product, (3) that the injury occurred because defendant's product was defective, and (4) that the defect was present in the product when it was sold by defendant. *Kerr v. Corning Glass Works,* 284 Minn. 115, 117, 169 N.W.2d 587, 588 (1969). It is clear that plaintiffs have established the first element and, if the second and third elements are proved, the fourth element. The troublesome question, and the issue on which defendants contest the jury verdict, is whether the Hudsons have established the second and third elements. Was there a defect in the dump truck? If so, did the defect cause Hudson's injury?

A product is defective if it fails to perform reasonably, adequately and safely the normal, anticipated or specified use to which the manufacturer intends that it be put, and it is unreasonably dangerous to the plaintiff.

\* \* \* \* .\* \*

In order to prove a defect, a plaintiff is not required to eliminate with certainty all possible causes of an accident. It is sufficient if the evidence reasonably eliminates improper handling or misuse of the product by others than the manufacturer, thus permitting the jury to reasonably infer that it was more probable than not that the product was defective.

*Daleiden v. Carborundum Co.,* 438 F.2d 1017, 1021–22 (8th Cir.1971) (citations omitted). The jury was, therefore, allowed to infer that the truck was defective unless appellants demonstrated misuse of the truck after it left their hands.

■ There is conflicting evidence on the issue of misuse. Although Snyder testified that the tailgate should be tripped before the hoist is activated, the jury could conclude from other testimony that Hudson had operated the hoist in an acceptable manner. Hudson testified that he followed the same procedure he had used previously. Sippo and Celusta stated that it is common to open the gate while the hoist is rising and that a driver should be able to open the gate when the hoist is up. From this testimony, the jury could have concluded that appellants should have anticipated the nature of Hudson's use and that the truck was defective because it failed to perform safely.

Appellants further argue that Hudson did not prove a causal link between any defect and Hudson's injury. It is true that no witness, including Hudson's expert, testified to a specific cause of the sudden drop of the box. However, Hudson testified that when he tried to lower the box it did not go down; and Sapetta stated that when an operator puts the hoist control in the "down" position the valve between the cylinder and the pump opens. From this testimony the jury could have concluded that air entered the system at that time; and, according to Sapetta's testimony, air in the system could have caused the failure of the hoist. Perfection's witnesses, Kennedy and Cleland, testified that a shift in the load's

center of gravity caused a pullout. From this the jury could have inferred that the height and weight of the load kept the box from descending when Hudson activated the "down" control. If that is true, the defect in the cam would have set in motion the events that caused Hudson's injury.

We have previously adopted Restatement, Torts (2d) § 402A, which provides that a commercial seller who sells a product in a defective condition unreasonably dangerous to the user is liable for physical harm to the user caused by the defective condition, even though the seller was not negligent and even though he was not in privity with the user. *McCormack v. Hankscraft Co.,* 278 Minn. 322, 154 N.W.2d 488 (1967). It follows that, if Snyder and Perfection are liable for designing, manufacturing and installing a defective cam, Potomac is liable for selling the truck in a defective condition. We therefore hold that there was sufficient evidence to support the jury's findings of strict liability with respect to Snyder, Perfection and Potomac.

3. The jury found that Potomac was negligent but assigned it 0% of the fault for Hudson's injury. Snyder and Perfection argue that it is impossible to reconcile these answers because it is wholly inconsistent for Potomac to be found negligent and yet have no liability for the award.

 In reconciling inconsistent answers in a jury verdict, "it is necessary to keep in mind that the verdict is to be liberally construed to give effect to the intention of the jury and to harmonize answers to interrogatories if it is possible to do so." *Reese v. Henke,* 277 Minn. 151, 155, 152 N.W.2d 63, 66 (1967). The trial court has a responsibility to try to reconcile inconsistent responses. *Bakke v. Rainbow Club, Inc.,* 306 Minn. 99, 235 N.W.2d 375 (1975). In this case, when the jury returned its verdict, the court ascertained from the foreman that the jury was aware of its inconsistent answers but did not ask the jury to reconsider or to reconcile its findings.

In its memorandum accompanying the order denying motions for a new trial, the trial court explained its reason for upholding the verdict apportioning no liability to Potomac. The court stated:

> In questioning the jury at the conclusion of the trial, they were quite adamant as to the way the interrogatories were answered in the Special Verdict. Shortly thereafter, the Court was informed that the jury, while feeling Potomac Ford Truck Sales was "negligent" in that the truck passed through their hands in the chain of commerce, they in no way bore any "fault" for plaintiff's injury. The Court feels that there may be a basis to warrant the changing of the answer to question number 14 to the negative as the evidence would possibly sustain such; however, in view of the case of *Gryc v. Dayton Hudson Corporation et al.,* [297 N.W.2d 727] (1980), the Court feels that such a change is unnecessary. It was apparent that the jury felt that such defective truck passed through the chain of commerce and while defendant Potomac may have been negligent in handling such defective truck, such was not in any way responsible for plaintiff's injury.

In *Gryc,* the jury found that cotton flannelette fabric was defective when it left the textile manufacturer because it was not sufficiently flame-retardant. Although the jury found that the pajamas were then also defective when they left the manufacturer, wholesaler and retailer, they held only the manufacturer liable for plaintiff's injuries and burns. 297 N.W.2d 727 (Minn.1980). In entering judgment consistent with the jury verdict, the trial court judge noted that the jury had recognized that only the fabric and not the design of the pajamas had been the cause of plaintiff's injuries. This court upheld that method of reconciling seemingly inconsistent answers.

The difference between this case and *Gryc* is that this jury found Potomac to be negligent as well as strictly liable. Therefore, in order to determine whether it is possible to reconcile the inconsistency in this verdict, we must examine whether the evidence supports the jury's finding of negligence on the part of Potomac.

"The basic elements necessary to maintain a claim for negligence are (1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury." *Schmanski v. Church of St. Casimir of Wells,* 243 Minn. 289, 292, 67 N.W.2d 644, 646 (1954). The Hudsons alleged in their complaint that Potomac had a duty to inspect the truck; however, they did not present at trial evidence of either the nature of Potomac's duty, a breach of that duty or a causal relationship between any breach and Hudson's injury. We therefore hold that the evidence does not support a finding of negligence on the part of Potomac and that the trial court erred in not directing a verdict for Potomac on the issue of negligence.

In the absence of a finding of negligence, the jury verdict is reconcilable under *Gryc.* In *Gryc,* the jury recognized that the fabric was defective when it left the manufacturer and that it remained defective as it moved through the stream of commerce. However, the manufacturer, wholesaler and retailer of the pajamas, although they sold the product in a defective condition, had done nothing to cause the defect. Their actions were not the cause of plaintiff's injuries.

In this case, Potomac sold Olsen a defective truck. However, the jury found that Potomac was not responsible for the defect. We find that these responses are not inconsistent and uphold the judgment of the trial court.

4–5. The trial court ordered that Perfection and Snyder were responsible for the $308,000 judgment, thereby denying the third-party claim for contribution from Olsen. Perfection and Snyder argue that the trial court erred in failing to enter judgment against Olsen as well. We reach this issue because we have determined that the evidence is sufficient to support a finding that Olsen was causally negligent and that the trial court did not err in denying Olsen's motions for a directed verdict and for judgment notwithstanding the verdict.

Olsen takes the position, as did the trial court, that, because Hudson could not have recovered from him under the comparative-fault statute had a direct suit been allowed, he is not liable to Perfection and Snyder for contribution.

It is true that Hudson could not have recovered from Olsen had direct suit been allowed, his negligence being as great as that of the employer; however, in *Lambertson v. Cincinnati Corp.,* 312 Minn. 114, 257 N.W.2d 679 (1977), we ruled that a third-party tortfeasor is entitled to contribution from an employer who is also found negligent. In *Johnson v. Raske Building Systems, Inc.,* 276 N.W.2d 79 (Minn.1979), we then built on *Lambertson* to set out a procedure for apportionment. There we held that the correct procedure is for third-party tortfeasors to pay the entire verdict to the plaintiff and then collect their contribution from the employer. The employer would be contributing according to his percentage of negligence, not to exceed the amount of workers' compensation benefits payable to the employee. The employee would then reimburse the employer pursuant to Minn.Stat. § 176.061, subd. 6(c) (1980). *Id.* at 81. Neither *Lambertson* nor *Johnson* provides that such contribution may be had only in the event that the employee's recovery in a direct suit would not have been barred by the comparative-fault statute.

The comparative-fault statute does not affect the apportionment procedure set out in *Johnson.* The statute addresses situations in which plaintiff brings an action against a negligent defendant and is barred from recovery because his fault is as great as the fault "*of the person against whom recovery is sought.*" Minn.Stat. § 604.01, subd. 1 (emphasis added). Hudson did not seek recovery from Olsen. Rather, the action against Olsen is a third-party action by Perfection and Snyder for contribution or indemnity. The special verdict apportioning Olsen's negligence could have been for no purpose other than ascertaining contribution, since Hudson was precluded from recovery from Olsen regardless of Olsen's degree of negligence.

We therefore hold that a third-party tortfeasor may recover contribution from a negligent employer under the principles of *Lambertson* and *Johnson* whether or not the employee, in a direct suit, would have been barred from recovery under the comparative-fault statute. To hold otherwise would benefit Olsen, who would receive a refund of the workers' compensation benefits he has paid, while Perfection and Snyder pay for his negligence. We reverse that part of the judgment which requires Snyder and Perfection to assume total responsibility for the award. In accord with *Johnson,* Snyder and Perfection should pay the entire amount of the verdict to the Hudsons. They are then entitled to collect from Olsen 20% of the total award, not to exceed the amount of workers' compensation benefits payable to Hudson.

Affirmed in part and reversed in part.

KELLEY, J., took no part in the consideration or decision of this case.

SIMONETT, Justice (concurring in part and dissenting in part).

1. First of all, I concur in the majority opinion that the jury's finding of strict liability on the part of the defendants should be affirmed. There is sufficient evidence from which the jury could have found that the truck, when sold, was in a defective condition and this defective condition was a cause of the accident. The fact is, however, that plaintiffs never proved why the hoist collapsed. The only evidence of a flaw in the truck unit was the defective cam in the linkage assembly, but it was never shown how this might be the cause of Hudson's injuries. Donald Hudson was struck because the hoist failed, not because the tailgate failed to open. Plaintiffs' expert was never asked if he had an opinion as to why the dump box dropped. Nor was the expert ever asked if he had an opinion as to how the defect in the linkage was a cause of the hoist's collapse.

It was, however, sufficiently shown that the dump box on this brandnew truck unit would not have dropped but for a defect in the unit. This case is a good illustration of the difference between a strict liability cause of action and negligence. Here plaintiffs, as a matter of law, never made out any negligence; and since the truck was not in the control of Hudson at all critical times, *res ipsa loquitur* did not apply. Strict liability, however, involves a relaxation of the rules of negligence law and permits here a finding of liability by the jury. *Compare, for example, Jagmin v. Simonds Abrasive Co.,* 61 Wis.2d 60, 211 N.W.2d 810 (1973).

2. Secondly, the jury found that the seller, Potomac Ford Truck Sales, Inc., sold a defective unit and that the defect was a cause of Mr. Hudson's injury, yet, in apportioning fault, the jury put Potomac's fault at zero. I do not think these answers are inconsistent. As the majority opinion points out, this only means the jury found that Potomac sold a defective truck but that Potomac "was not responsible for the defect." I do not understand the majority to mean by this that Potomac is not liable to plaintiffs in strict liability, only that *Potomac's liability "stems solely from its passive role as the retailer of a defective product furnished to it by the manufacturer." Farr v. Armstrong Rubber Co.,* 288 Minn. 83, 97, 179 N.W.2d 64, 73 (1970). In other words, Potomac is liable to plaintiffs but only in a vicarious or derivative sense as the inert seller in the marketing chain. This is not the kind of conduct that needs to be included in a comparative fault question, and the jury properly ignored it. Potomac should be found liable to plaintiffs but entitled to indemnity from the other defendants, as was done in *Farr, supra,* and *Jack Frost, Inc. v. Engineered Building Components Co., Inc.,* 304 N.W.2d 346 (Minn.1981). *Tolbert v. Gerber Industries, Inc.,* 255 N.W.2d 362 (Minn.1977), does not preclude indemnity in this situation.

3. Finally, since the jury found both the plaintiff-employee Hudson and the third-party defendant employer, Jack L. Olsen, Inc., 20% at fault, the trial court held that Perfection and Snyder, the two manufacturers, were not entitled to contribution from Olsen. The majority opinion holds this ruling was error. I disagree.

*Lambertson v. Cincinnati Corp.,* 312 Minn. 114, 257 N.W.2d 679 (1977), holds that a third-party tortfeasor is entitled to contribution from the employer in an amount proportional to the employee's percentage of fault but not to exceed its workers' compensation liability. In *Lambertson,* the employee was only 15% negligent while the employer was 60% negligent; in other words, the employer would have been liable to plaintiff under comparative negligence law but for workers' compensation immunity. The employer was similarly situated in *Johnson v. Raske Building Systems, Inc.,* 276 N.W.2d 79 (Minn.1979). Neither *Lambertson* nor *Johnson* reached the question whether comparative fault liability principles were to be ignored.

How to adjust liabilities and apportion loss when the principles of a common-law, comparative fault action conflict with the counter policies of the workers' compensation law is perplexing. In *Lambertson,* to achieve a more equitable result, we relaxed the technical requirements for contribution, but it does not seem to me we should now rely on technicalities to relax comparative fault principles.

The fact Hudson was not seeking to recover from Olsen does not seem to me of much weight. If Olsen had not been an employer immune from suit by plaintiff, then surely Olsen's liability for contribution to the defendant third-party plaintiffs who sued him would depend on Olsen's fault being less than plaintiff's. Liability should not depend on the status of the pleadings. In judging the conduct of the parties, the jury is not concerned with who is a direct defendant and who is a third-party defendant. Perhaps Olsen's right to reimbursement for compensation benefits should be curtailed because of its 20% fault. Since reimbursement is subject to equitable principles, this could be done; but I do not think we should create a pure comparative fault exception to our comparative fault law.