Sarah LANE, a minor, and Allison Lane, a minor, by Jeffrey P. LANE, their father and natural guardian; Jeffrey P. Lane, individually; and Sally M. Lane individually, Appellants,

v.

**SKYLINE FAMILY MEDICAL CENTER, etc., et al., Respondents.**

No. C8–84–840.

Court of Appeals of Minnesota.

Feb. 26, 1985.

Harry Sieben, Jr., Grose, Von Holtum, Sieben & Schmidt, Ltd., Minneapolis, for appellants.

Gene Halverson, Charles Bateman, Halverson, Watters, Bye, Downs & Maki, Ltd., Duluth, for respondents.

Heard, considered and decided by PARKER, P.J., and SEDGWICK and LESLIE, JJ.

## OPINION

PARKER, Judge.

Plaintiffs brought this medical malpractice action against the defendant medical group, alleging negligent prenatal care and treatment of plaintiff Sally Lane by Dr. D.J. Hiza, a family practitioner. Plaintiffs claim the premature birth of plaintiff Sarah Lane and her twin sister Allison Lane caused Sarah to suffer mental retardation and cerebral palsy. After a trial, the jury returned a special verdict finding that plaintiff Sarah Lane suffered $1,570,000 in damages and that plaintiffs Jeffrey and Sally Lane, Sarah's parents, suffered $94,054 in damages but found that the defendant physician was not negligent. It did not reach the causation issue.

Plaintiffs moved for a new trial or alternatively for judgment notwithstanding the verdict. The trial court denied plaintiff's blended motions, and judgment was entered. We affirm.

## FACTS

Sally Lane, a 23-year-old mother of two, recorded a positive pregnancy test on April 6, 1979. She had delivered children in 1973 and 1977 following normal pregnancies. On April 16, 1979, when an estimated 12½ weeks pregnant, Sally Lane visited Skyline Family Clinic for examination by D.J. Hiza, M.D. Lane's uterus measured a fundal height (height of uterus above pubic bone) of 17 centimeters, somewhat large for her reported date. On May 16, 1979, Hiza examined her again and measured her fundal height at 22 centimeters, unusually large for the 17th week of pregnancy. Lane reported "quickening" although fetal heart tones could not be heard with a fetascope. On June 20, 1979 (22nd week), Lane discovered vaginal discharge and called Hiza to inform him. When she visited Hiza the next day for her regularly scheduled appointment, her uterus measured an abnormally large fundal height of 27 centimeters.

Hiza next examined Sally Lane on July 20, 1979, when her fundal height measured 34½ centimeters. Because her measurements remained abnormally high, Hiza ordered an ultrasound study, which on July 24, 1979, confirmed a twin pregnancy. At that time the twins were average size for the 26th week of pregnancy. Lane was unable to see Hiza following the July 20 examination until August 1, 1979, when she set up an appointment. At that appointment Hiza advised Lane on caring for herself during the pregnancy.

### Premature labor and birth

On August 8, 1979, Sally Lane called Hiza complaining of pain, pressure and discomfort. On August 12, 1979, Lane telephoned Hiza to report intermittent contractions and requested an appointment for the next day. Although Hiza believed Lane suffered the normal discomfort of a multiple pregnancy, he made an appointment for the next day, August 13, 1979. At that appointment Lane's fundal height was apparently not measured, but records show

her cervix was dilated one centimeter and with approximately 80 percent effacement. Effacement is the thinning of the cervix tissue, which may indicate the onset of labor. Hiza continued to believe Lane's problems were normal and advised her to be comfortable.

The evening of August 16, 1979, Lane telephone Hiza and reported vaginal bleeding, "pink show", and tightenings or pressure pain. Hiza told Lane to go to the Skyline Family Clinic the next morning but instructed her to go to the hospital if she experienced any contractions. Lane did not experience contractions until the morning of August 17, 1979. Hiza sent her to the hospital, where she received care from Hiza and a specialist in obstetrics and gynecology. Plaintiffs do not claim her care at the hospital deviated from professional standards.

At the hospital another ultrasound study revealed a variation in the size of the two fetuses. Sarah Lane was substantially larger than Allison. The physicians gave the mother Betamethasone to accelerate fetal lung development and Vasocilan to inhibit the labor process. The membranes nevertheless ruptured, and both babies were born on August 19, 1979.

### Diagnosis following birth

Post-natal examination showed Sarah Lane suffered an intraventricular hemorrhage (bleeding into the brain—often from an undeveloped lung), causing significant brain damage. Physicians also diagnosed a twin-to-twin transfusion syndrome, which occurred in the uterus, affecting both twins. The syndrome causes one of the twins to transfuse blood to the other. As a result the donor baby receives decreased nutrition and oxygen while the donee baby receives more. Both babies can suffer problems. The baby receiving too much blood, here Sarah Lane, may experience high blood pressure in the body, which may cause other problems. It may also cause polyhydramnios, an excess of fluid around the donee baby urinating the excess fluids it receives in the blood. Polyhydramnios increases pressure in the uterus and may contribute to premature labor. In this case the doctors diagnosed severe polyhydramnios.

At birth the twins had very different hemoglobin levels—Sarah's level was too high, and Allison's level was too low. Allison measured 38 centimeters in length and weighed 1,020 grams, while Sarah measured 33.5 centimeters and weighed 1,300 grams. Sarah's head size was 28.5 centimeters while Allison's was 25.5. Allison's extraordinarily high red blood cell count of 660—compared with a normal count of 40 to 50—confirmed the existence of the twin-to-twin transfusion syndrome.

### Plaintiffs' two theories of the case

Plaintiffs presented two theories to establish Dr. Hiza's negligence. Under both theories plaintiffs argued that Sarah's premature delivery caused the interventricular hemorrhage, which resulted in mental retardation and cerebal palsy.

Plaintiffs' first theory is that Dr. Hiza provided sub-standard care to Sally Lane until she was hospitalized. Plaintiffs claimed at trial that Hiza should have investigated the possibility of a multiple pregnancy through ultrasound studies on June 21, 1979, after Sally Lane's fundal height measurements remained abnormally high. They introduced the testimony of Richard P. Bendel, M.D., a specialist in obstetrics, gynecology and maternal-fetal medicine. Bendel testified that the failure to make early diagnosis prevented Sally Lane from taking precautionary measures which may have prolonged the pregnancy. According to Bendel, such measures included increased resting and decreased activities from the 26th week of gestation forward.

Plaintiffs also argued that after the discovery of the twin pregnancy on July 24, 1979, Hiza should immediately have advised Sally Lane to decrease activities and to rest for substantial periods. His advice, according to Dr. Bendel, should have included an explanation of both the importance of fetal development during the 26th

to 31st weeks, which she was just beginning, and the increased risk of premature delivery in a twin pregnancy. In addition, he should have examined her cervix for any premature changes in her cervix indicating the onset of labor, because of the increased risk of premature delivery.

Plaintiffs contended that Hiza's care for Sally Lane on August 13, 1979, was negligent as well. Dr. Bendel testified that Dr. Hiza should have hospitalized Sally Lane immediately and prescribed Vasodilan to inhibit labor. These measures should have been taken because the pressure, contractions, and 80 percent cervical effacement and cervical dilation all indicated premature labor, which presented a significant danger to the fetuses during the 29th week.

Plaintiffs argued a second negligence theory: Dr. Hiza's failure to consult with a specialist or refer Sally Lane to a specialist. The only testimony directly supporting this theory was elicited in defendants' cross-examination of Dr. Bendel. He testified that "the family doctor is well-qualified to take care of many problems and those that he's qualified to take care of, he must take care of those patients with the same standards as the specialist." He went on to explain: "What I am saying is that they must be able to recognize an abnormal pregnancy and get consultation or help when the pregnancy deviates from normal, beyond their capabilities." Dr. Bendel, however, also testified on direct examination that the standard of care in Minnesota for mothers expecting twins is the same for family practitioners as for specialists.

### Defendant's theory of the case

Dr. Hiza's witnesses offered a different opinion on the standard of practice. Harry F. Farb, M.D., a maternal medicine specialist at St. Paul Ramsey Hospital, testified that Dr. Hiza's treatment met professional standards. He testified that Hiza ordered the ultrasound treatment at the proper time. According to Dr. Farb, Dr. Bendel's recommendation to order bedrest after diagnosis of twins on July 24, 1979, was controversial advice of questionable value.

Dr. Bendel himself admitted that the medical community differed in its opinion on the need for rest in the later stages of pregnancy.

Farb also testified that Hiza's advice to Sally Lane on August 12 to be comfortable and his examination of her on August 13 were not departures from professional standards. In Farb's opinion, Hiza's advice to Sally Lane on August 16 to go to the hospital if contractions started but otherwise to see him in the morning was within normal practices for family practitioners. Finally, Farb testified that specialists in obstetrics, gynecology or perinatalogy would have not treated Sally Lane differently than Dr. Hiza treated her.

Defendants also presented testimony on causation from Norman Virnig, M.D., a neonatologist. Dr. Virnig testified that the twin-to-twin transfusion syndrome and the associated polyhydramnios contributed to premature labor. Had labor been delayed further and the pregnancy prolonged, in his opinion, Sarah Lane may have suffered more damage than she now suffers. He also believed that a continued pregnancy might have seriously affected Allison Lane.

Defendants also presented evidence from Dr. Hiza and from Cynthia McCormick, M.D., a pediatric neurologist. McCormick was a member of a medical team that had examined and treated Sarah. She testified on her diagnosis of Sarah's mental retardation and cerebral palsy, giving an opinion on Sarah's condition considerably more optimistic than that given by plaintiffs' expert witness, Dr. Noran, a neurologist.

### ISSUES

1. Did the trial court err by refusing to instruct the jury on defendant family physician's duty to refer his twin-pregnancy patient to a specialist?

2. Was the testimony of a treating physician improperly introduced by defendants when defendants failed to disclose the witness before trial?

3. Did the evidence conclusively establish both that defendant physician negli-

gently treated his pregnant patient and that his negligence caused plaintiffs' damages?

## DISCUSSION

### I

■ Plaintiffs contend they established a prima facie case that Dr. Hiza negligently failed to refer Sally Lane to a specialist, entitling them to an instruction on that theory. Litigants are entitled to an instruction only when they present evidence supporting their theory of the case. *Lhotka v. Larson*, 307 Minn. 121, 125 n. 7, 238 N.W.2d 870, 874 n. 7 (1976). The duty to refer theory was first applied in a medical malpractice case in *Manion v. Tweedy*, 257 Minn. 59, 100 N.W.2d 124 (1959). In *Larsen v. Yelle*, 310 Minn. 521, 246 N.W.2d 841 (1976), the supreme court described the circumstances in which the duty to refer applies:

> [O]ne of the requirements which the law exacts of general practitioners of medicine is that if, in the exercise of the care and skill demanded by those requirements, such a practitioner discovers, or should know or discover, that the patient's ailment is beyond his knowledge or technical skill, or ability or capacity to treat with a likelihood of reasonable success, he is under a duty to disclose the situation to his patient, or to advise him of the necessity of other or different treatment.

*Id.* at 525, 246 N.W.2d at 845. Once the duty is established and plaintiff shows the physician breached the duty, the physician is held to the standard of care applicable to the specialty to which referral should have been made. Only after plaintiff shows the general practitioner failed to meet the specialist's standard will liability be imposed. *Id.*

■ We agree with the trial court that plaintiffs did not present the foundational evidence entitling it to an instruction under *Larsen.* No testimony introduced at trial tends to support the conclusion that an expert would have been better qualified to treat a woman with Sally Lane's symptoms. Plaintiffs' own expert witness, Dr. Bendel, testified that only one standard of care exists in Minnesota for the treatment of mothers with twin pregnancies.

■ This point reveals another flaw in plaintiffs' theory. Even if a duty to refer existed and Dr. Hiza breached that duty, plaintiffs still needed to establish the final element under *Larsen:* that Hiza's care did not meet a specialist's standards. Since the same standard of care applies for family practitioners as specialists, according to Dr. Bendel, breach of the duty to refer in this case would not change the standard of care. The failure to give the instruction, even if error, would be harmless in this case.

### II

■ Plaintiffs claim that the trial court abused its discretion when it allowed defendants to call Dr. McCormick, a treating physician, as an expert witness. Defendants had failed to disclose McCormick in response to plaintiffs' interrogatory before trial.

The events leading up to defendants' disclosure of McCormick the first day of trial are significant. Late in the parties' pretrial preparations Dr. Noran revised earlier reports to indicate that Sarah Lane would require around the clock attention for the rest of her life. Five days before trial, defendants received plaintiffs' disclosure that their expert economist, basing his estimates on Dr. Noran's revised statements, would testify that Sarah Lane's economic loss totaled $4,765,000 to $5,388,000. Defendants, seeking evidence to rebut Dr. Noran's testimony, contacted Dr. McCormick and immediately notified plaintiffs of their intent to introduce her testimony. Rather than ask for a continuance, plaintiffs sought to exclude Dr. McCormick's testimony for failure of defendants to make timely disclosure.

McCormick testified that Sarah Lane's mental retardation and cerebral palsy were related to the twin-to-twin transfusion syndrome, which explained why Allison did not

also suffer the same problems. She also gave her opinion that Sarah would be able to care for herself when she matured, was educable, and would be employable. She offered no opinion on the standard of care Dr. Hiza should have exercised.

We do not find fault with either party for not making earlier disclosure of the expected testimony. Nor can we criticize plaintiffs for not moving for a continuance, given the cost of an expert's time. We do find admission of Dr. McCormick's testimony well within the trial court's discretion. *See Cornfeldt v. Tongen,* 262 N.W.2d 684, 697 (Minn.1977); *Phelps v. Blomberg Roseville Clinic,* 253 N.W.2d 390, 394 (Minn.1977).[1]

■ Even if we assume that plaintiffs are correct that the trial court abused its discretion in allowing Dr. McCormick's testimony, it could not have constituted prejudice. McCormick's testimony did not address defendants' negligence, referring only to causation and the amount of Sarah Lane's damages. Since the jury found no negligence, admission of the testimony was harmless error, if error at all.

### III

■ A trial court should grant a motion for judgment notwithstanding the verdict if "the moving party would have been entitled to a directed verdict at the close of evidence." Minn.R.Civ.P. 50.02; *see also Dean v. Weisbrod,* 300 Minn. 37, 41, 217 N.W.2d 739, 742 (1974).

> [A] motion for a directed verdict * * * should be granted only in those unequivocal cases where (1) *in the light of the evidence as a whole,* it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the *entire* evidence, or where (2) it would be contrary to the law applicable to the case.

*Hanrahan v. Safeway Steel Scaffold Co. of Minnesota,* 233 Minn. 171, 176, 46 N.W.2d 243, 247 (1951) (emphasis in original) (citation omitted). A court examining the evidence must take a view favoring the verdict. *Devine v. McLain,* 306 N.W.2d 827, 830 (1981).

To prevail on this issue plaintiffs not only must establish that the evidence compelled a finding of negligence but also a finding of causation.

■ The evidence on negligence was contradictory, particularly the evidence on the applicable standard of care. In malpractice cases the standard of care is a question of fact for the jury. When there are two or more established treatments which may reasonably be applied, a physician has the right to use his best judgment in selecting the treatment. *Kinning v. Nelson,* 281 N.W.2d 849, 853 (Minn.1979). Plaintiffs' expert, Dr. Bendel, testified the standard of care required earlier diagnosis of twins, advice to rest during the later weeks of pregnancy, and, after signs of premature labor, hospitalization and labor-inhibiting drugs. Defendants' expert, Dr. Farb, testified to a very different standard of care that conformed with Dr. Hiza's treatment. Both physicians apparently agreed that they came from different schools of thought on the treatment of women pregnant with twins. Since the jury may have believed Dr. Farb's testimony directly contradicting plaintiffs' evidence of negligence, the trial court properly denied the motion for judgment notwithstanding the verdict.

■ Even if a directed verdict on negligence were justified, the evidence on the cause of Sarah Lane's mental retardation and cerebral palsy conflicted. Plaintiffs claimed that Dr. Hiza's failure to prolong the pregnancy caused the hemorrhaging which damaged Sarah Lane's brain. Dr. Virnig, however, testified that prolonging the pregnancy would have caused further harm to both babies. Resolution of con-

---

1. We also note that some of the difficulties commonly experienced by parties in discovering an expert's testimony did not exist here. Dr. McCormick examined Sarah Lane as a member of a team of treating physicians. She was not an adverse medical witness retained by defendants to make an examination and testify at trial.

flicting testimony is the function of the jury.

## DECISION

The judgment entered in favor of defendants is affirmed.

LESLIE, J., concurs specially.

LESLIE, Judge, concurring specially:

I concur in the result. However, I believe the trial court erred in refusing to instruct the jury on the physician's duty to refer Sally Lane to a specialist. Notwithstanding this error, I am satisfied after reviewing the proceedings that the error in this case was not so prejudicial as to justify a new trial.