Lester L. ABY, Appellant,

v.

ST. PAUL UNION
STOCKYARDS, Respondent.

No. C5–85–322.

Court of Appeals of Minnesota.

Sept. 3, 1985.

Review Denied Nov. 18, 1985.

Steven A. Nelson, International Falls, for appellant.

Norman W. Larsen, Minneapolis, for respondent.

Heard, considered and decided by CRIPPEN, P.J., and SEDGWICK and NIERENGARTEN, JJ.

## OPINION

SEDGWICK, Judge.

This appeal is from a judgment dismissing appellant's action and the denial of a motion for new trial or judgment notwithstanding the verdict. Appellant sustained injuries when he was hit by a charging steer at respondent's stockyard. He claims his injuries were caused in part by a defective gate latch mechanism constructed by respondent. The trial court denied proposed instructions on strict liability in tort. We affirm.

## FACTS

Appellant Lester Aby was assigned by his trucking company to pick up a load of steers at respondent St. Paul Union Stockyards and transport them to Omaha, Nebraska. Respondent operates a livestock receiving and shipping facility in South St. Paul. When a trucker picks up cattle from the stockyard, the commissioned buyer has already made arrangements with respondent to release the agreed upon number of cattle and deliver them to a holding pen in the load out area. Once the cattle are delivered to the holding pen, control of the livestock is turned over to the buyer or his agent. Respondent does nothing further to assist in the load out procedure other than

assign a dock and load out chute to transfer the cattle from the holding pen to the truck.

The load out area of the stockyard has a long concrete dock built to a height equal to that of a truckbed. Once assigned to a load out area the trucker backs his rig up to the dock. On the opposite side of the dock is a load out ramp which slopes downward and gradually narrows into a chute that leads to the holding pen. The holding pen has a gate on the dock side which opens into the loading chute. There is also a gate located approximately five feet from the ramp which the cattle walk up to enter the truck. It is possible with a gate on either side of the loading chute to hold several steers in the chute before allowing them to enter the truck, aiding in control of the cattle and verification of their numbers.

The gates, hinges, and latches are made at respondent's stockyard. Respondent's employees install them at each of the loading dock sites. The latch mechanism has two parts. One is an L-shaped hook attached to the swinging gate. The other part is an eyebolt attached to the fence adjacent to the gate. To close the gate the L-shaped hook must be dropped into the eyebolt.

Appellant and a co-employee were loading steers at respondent's stockyard on May 27, 1977. Appellant was working from the holding pen and the chutes, and the co-employee was positioning cattle in the truck. After loading one section of the truck it was necessary to reposition one steer which had been sent up the loading ramp by mistake. The steer was directed back into the holding pen. Appellant then sent the steer back into the loading chute and up the ramp. As appellant was securing the second gate behind the steer, it suddenly turned in the chute and came down the ramp toward the gate. Appellant saw the steer coming but continued trying to latch the gate. The steer hit the gate, swinging it into appellant and pinning him against the fence. The steer meanwhile continued past the gate and back into the loading chute area.

Appellant maintains his injuries were caused in part by a defective latch mechanism manufactured by respondent's blacksmith shop for the stockyard's own use. Appellant requested jury instructions on both landowner liability and strict liability in tort for the defective latch. The trial court instructed the jury on landowner liability but declined to give the requested instruction on strict liability.

The jury returned a verdict finding respondent 15% negligent and appellant 85% negligent. Judgment was entered dismissing appellant's claim.

## ISSUE

Did the trial court err in refusing to instruct the jury on strict liability in tort?

## ANALYSIS

### I

█ A trial court may properly refuse a proposed instruction if there is no evidence supporting a litigant's theory of the case. *Lane v. Skyline Family Medical Center*, 363 N.W.2d 318 (Minn.Ct.App.1985); *Weiby v. Wente*, 264 N.W.2d 624 (Minn.1978); *Lauer v. Loecken*, 295 Minn. 345, 204 N.W.2d 817 (1973).

Appellant claimed two defects in the latch manufactured by respondent. 1) The latch was located on the wrong side of the gate (the chute side rather than the holding pen side) and 2) the eyebolt had been pushed so far into the fencepost that the L-shaped hook on the gate would not drop through the eyebolt without taking time to reposition it.

█ In support of his products liability theory appellant called two expert witnesses: John Katz, a gate manufacturer and designer from Hull, Iowa and Fulton Holtby a retired mechanical engineering professor from the University of Minnesota. Katz testified that a two inch latch manufactured by his company has several advantages over the ½ inch diameter L-shaped hook and eyebolt mechanism used by respondent, including faster operation of the

latch and additional safety features. Although he expressed a preference for his particular design, Katz gave no opinion as to whether any design defects were present in respondent's latch mechanism. Katz further testified that if he were installing a hook and latch mechanism similar to respondent's he would do so on the holding pen side rather than the chute side. By placing the latch on the pen side a cattle handler in the chute area would not have to reach through the gate to set the latch.

Fulton Holtby's testimony included a detailed summary of engineering procedures he would use in determining which gate and latch mechanism is appropriate for use at a stockyard. He criticized respondent's design because the latch mechanism could not be engaged rapidly. Holtby preferred a latch manufactured by the Katz' company because it is stronger and easier to engage. Holtby stated that respondent's latch should be installed on the holding pen side, rather than the chute side of the gate.

John Affelbacher, vice-president of operations at the stockyard, testified that the 2 inch latch manufactured by Katz' company was unsuitable for use at the stockyard. Katz's latch has a bolt mechanism which sticks out into the chute area. Because a cattle handler must work inside the chute while loading steers the bolt mechanism creates a safety hazard when the handler is knocked against it by a steer. (Affelbacher testified that it is not unusual for cattle handlers to be kicked or pushed against fences when transferring cattle to the truck.) The bolt mechanism also cuts and bruises the livestock, reducing the price received when the animal is butchered because that portion of the meat must be discarded.

Affelbacher stated that the gate and latch used by appellant when he was injured was not the subject of any repair order, nor had any cattlehandler given notice to the stockyard or its employees of difficulty in operating the latch. He stated that the method chosen by appellant to reload the steer was improper. Rather than attempt to halt a steer charging down a ramp, appellant should have left the gate open, climbed the fence and allowed the steer to return to the holding pen. After the steer had settled down, appellant could then turn and direct the steer back into the truck.

Each year several of respondent's employees, including Affelbacher, visit a different stockyard studying new operations and observing their maintenance procedures. Affelbacher stated that every facility visited uses a hook and latch mechanism identical to respondent's.

The stockyard has been using the hook and eyebolt latch since 1941. Several times throughout the year stockyard employees observe over a period of time the latch mechanism in operation. Engineers and other consultants are hired to inspect the gates and latches and asked to comment on their effectiveness. The stockyard has experimented with other types of mechanisms but has always returned to the hook and latch method. It was Affelbacher's opinion as an operating manager, as well as an engineer, that the gate mechanism used by respondent in 1977 could not have been made safer.

In *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149 (Minn.1982), the Minnesota Supreme Court said each of the following elements must be established in order to recover on a theory of strict liability:

> (1) that plaintiff was injured, (2) that the injury was caused by defendant's product, (3) that the injury occurred because defendant's product was defective, and (4) that the defect was present in the product when it was sold by defendant. *Kerr v. Corning Glass Works*, 284 Minn. 115, 117, 169 N.W.2d 587, 588 (1969).

Id. at 155.

Here, expert testimony did not establish that the latch was defective for its intended purpose.

## DECISION

Evidence presented by appellant to support his theory of the case was insufficient

to instruct the jury on strict liability in tort. Affirmed.