Thomas QUILL, et al., Plaintiffs,

Dean Abrahamson, Respondent,

v.

TRANS WORLD AIRLINES, INC., Appellant.

No. C8–84–1325.

Court of Appeals of Minnesota.

Jan. 29, 1985.

Review Denied April 18, 1985.

James R. Schwebel, Diane C. Hanson, Schwebel, Goetz, Sieben & Hanson, P.A., Minneapolis, for respondent.

Donald Chance Mark, Jr., Gayle Hendley-Zappia, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp, & Brennan, Minneapolis, for appellant.

Heard, considered and decided by LESLIE, P.J., and WOZNIAK and LANSING, JJ.

## OPINION

LESLIE, Judge.

Plaintiff Dean Abrahamson brought this action for the emotional distress he allegedly suffered while a passenger on appellant-defendant TWA's Boeing 727. Trial on the issue of liability for plaintiff's claim and those of other passengers on the jet began on May 10, 1983. A jury found TWA 70% causally negligent and co-defendant The Boeing Company 30% causally negligent.

Plaintiff's claim for damages and those damage claims of three other passengers/plaintiffs were consolidated for trial. Before trial The Boeing Company was dismissed as a defendant when it entered a *Pierringer* release with the plaintiffs. The jury found plaintiff suffered $50,000.00 in damages. The jury found plaintiff suffered $50,000.00 in damages. TWA moved for judgment notwithstanding the verdict or, alternatively, for a new trial on plaintiff's damage claim. The trial court denied those motions and TWA appealed from entry of judgment.

## FACTS

On April 4, 1979, TWA flight 841 from New York to Minneapolis was cruising at an altitude of 39,000 feet when it suddenly rolled over and plunged downward. Its tailspin continued for the next 40 seconds at speeds just below the speed of sound, causing the plane to violently shake. At approximately 5,000 feet the pilots regained control of the plane, about 5 seconds before it would have struck ground. The force exerted on the plane and the passengers equalled approximately 6 G's. Testimony indicated that force wrinkled the fuselage skin of the aircraft and bent its wings.

Plaintiff is a medical doctor who does not practice; he teaches and consults on nuclear energy and environmental policy issues. He is 48 years old and married. His work requires him to make approximately 20 business trips per year, involving about 60 flights. On this flight he was returning to Minneapolis from Europe via New York. When the plane rolled over and started its accelerating dive, he believed that his death was certain. He testified that the G force was so strong that he could not lift his arm to reach the oxygen masks which had shaken loose. Plaintiff believed even if the child in the seat next to him had been screaming he could not have heard over the incredible noise generated.

When the airliner pulled out of the tailspin, it continued to shake and make unusual noises, but much less than during the dive. The cabin crew picked up some of the trays and articles in the aisles and instructed the passengers on emergency procedures. One stewardess pulled all the pillows and soft articles from the overhead lockers which she gave to the passengers to use, instructing them to assume the emergency landing position. The pilot informed the passengers over the intercom that they had experienced some problems and that they would make an emergency landing in Detroit, Michigan. The flight crew, however, did not explain the problem, indicate the condition of the plane, or assure the passengers that they would land safely.

During the next forty minutes the plane continued to shake and make considerable noise. The plane made one low pass over the Detroit airfield so that ground personnel could determine if the landing gear had lowered. Plaintiff testified that he could see the emergency vehicles by the runway, waiting for the landing. The plane then landed safely, but at a higher speed than normal.

Since the incident, plaintiff has continued to fly for business purposes. On about 50 percent of the flights he experiences anxiety and recalls his feelings that night. His anxiety is often triggered by sudden changes in an aircraft's direction. Plaintiff's fear manifests itself physically in adrenaline surges, sweaty hands, elevated pulse and blood pressure. In a few instances plaintiff has not been able to take his scheduled flight, because of his concerns, and has taken a later plane instead. His wife says it sometimes takes him two days to relax after a flight. Plaintiff has not consulted any medical professionals about his problem because, as a doctor, he believes they could do nothing for him.

## ISSUES

1. Did plaintiff present a prima facie case for negligent infliction of emotional distress?

2. Did the trial court properly refuse to notify the jury that a co-defendant had settled when plaintiff submitted deposition testimony of the co-defendant's employee?

3. Did the trial court improperly allow evidence on the damage to the airplane and on the cost of repairing the airplane?

4. Did the consolidation for trial on damages of plaintiff's claim with other plaintiff's claims constitute an abuse of discretion?

5. Did the trial court abuse its discretion by excluding testimony of defendant's expert witness for lack of timely notice?

6. Was plaintiff's testimony on his symptoms and on his investigation of medical literature "expert medical testimony" that should have been disclosed prior to trial?

7. Was plaintiff's attorney's closing argument so improper and prejudicial that the trial court should have acted on its own motion?

## ANALYSIS

### 1. Negligent Infliction of Emotional Distress

The primary issue on appeal is the merit of plaintiff's case for damages for emotion-al distress. Defendant TWA claims that plaintiff's injuries are not compensable as a matter of law.

The seminal Minnesota case on negligent infliction of emotional distress is *Purcell v. St. Paul City Railway,* 48 Minn. 134, 50 N.W. 1034 (1892). In *Purcell* a pregnant woman was severely frightened when the cable car she was riding in nearly collided with another cable car. Her fear caused her to convulse violently, leading her to miscarry her child. She sued for damages for her miscarriage, alleging the railway company negligently caused the near collision. The supreme court said:

> The mind and body operate reciprocally on each other. Physical injury or illness sometimes causes mental disease. A mental shock or disturbance sometimes causes injury or illness of body, especially of the nervous system. Now, if the fright was the natural consequence of— was brought about, caused by—the circumstances of peril and alarm in which defendant's negligence placed plaintiff, and the fright caused the nervous shock and convulsions and consequent illness, the negligence was the proximate cause of those injuries. That a mental condition or operation on the part of the one injured comes between the negligence and injury does not necessarily break the required sequence of intermediate causes.

*Id.* at 138, 50 N.W. at 1035.

Later cases have modified the rules for recovery of damages for emotional distress. In cases like the present one where the plaintiff did not suffer a contemporaneous physical injury, the "zone of danger" rule applies. *Stadler v. Cross,* 295 N.W.2d 552, 555 (Minn.1980). In *Langeland v. Farmers State Bank,* 319 N.W.2d 26 (Minn.1982) the supreme court wrote:

> [T]he general rule regarding the negligent infliction of emotional distress has been that there can be no recovery absent some accompanying physical injury. *See* W. Prosser, *Handbook of the Law of*

*Torts* § 54, at 328–29 (4th ed. 1971). In cases in which physical symptoms occur subsequent to and because of the plaintiff's emotional disturbance, many jurisdictions, including this one, require the plaintiff to have been in some personal physical danger caused by the defendant's negligence before awarding damages for emotional distress.

*Id.* at 31.

The Minnesota cases establish that damages for emotional distress are compensable under the zone of danger rule, but leave unanswered the narrower question raised here: How severely must the emotional distress physically manifest itself before the law will provide a remedy under the zone of danger theory?

Two Minnesota cases allowing recovery for emotional distress fit squarely under the zone of danger rule: *Purcell* and *Okrina v. Midwestern Corp.*, 282 Minn. 400, 165 N.W.2d 259 (1969). In *Okrina* a wall of the store in which plaintiff was shopping collapsed making a thunderous noise. Plaintiff was afraid the whole building would collapse but she escaped without being struck by any debris. Following the incident she felt numb and sought hospital care. She spent five days receiving treatment for severe pain in her head, back and leg. Her doctor testified that her condition resulted from her fright, that her personality had been altered, and that it was unlikely she would improve. The court said:

> Here, there was a physical injury sustained as a result of Mrs. Okrina's fear and not merely mental anguish unaccompanied by symptoms of physical suffering * * *

*Id.* at 404, 165 N.W.2d at 262.

The symptoms of physical suffering of the plaintiffs in *Okrina* and *Purcell* evidently met the undelineated threshold. While plaintiff Abrahamson's physical symptoms are not so severe, nothing in those cases suggests Abrahamson's injuries are not serious enough to warrant recovery.

TWA argues a recent decision should guide our analysis. In *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428 (Minn.1983) the Minnesota Supreme Court recognized for the first time the independent tort of *intentional* infliction of emotional distress. *Hubbard* ended a long period in Minnesota law where damages for emotional distress could only be recovered under the negligence theory outlined above, or under a "parasitic tort" theory. *See* Note, *Minnesota's "New Tort": Intentional Infliction of Emotional Distress*, 10 Wm. Mitchell L.Rev. 349 (1984) (recovery was parasitic because the emotional suffering must have arisen out of an "host" tort such as assault or mistreatment of a corpse).

The supreme court adopted the Restatement formulation of the tort requiring four elements: (1) extreme and outrageous conduct which is (2) reckless or intentional (3) causing (4) severe emotional distress. *Hubbard*, 330 N.W.2d at 438–39; Restatement (Second) of Torts § 46(1) (1965). The court stated:

> Although our support of the policy of protecting the judicial process from trivial and speculative claims by restricting tort recoveries for mental distress is undiminished, we no longer feel that a rule requiring physical injury or an underlying tort is the most effective way to promote this policy. Rather, it is the view of this court that the problems inherent in allowing recoveries for mental and emotional disturbances can be more clearly and adequately addressed if intentional infliction of emotional distress is recognized as a separate and independent tort.

*Hubbard*, 330 N.W.2d at 438.

TWA claims that a plaintiff under the negligent infliction of emotional distress theory must meet *Hubbard*'s demanding burden of severe emotional distress. It is doubtful that plaintiff Abrahamson's injuries meet the *Hubbard* standard for he never sought medical care, a factor of obvious importance to the supreme court. *See id.* at 440; *Langeland*, 319 N.W.2d at 29.

We need not decide that question, however, for we decide that the *Hubbard* standard does not apply to negligent infliction of emotional distress cases. First, the supreme court did not state the independent tort of intentional infliction of emotional distress displaced all other torts in which damages for emotional distress had been allowed. Second, cases decided as recently as *Langeland* refer to physical symptoms without suggesting plaintiffs must meet the high threshold adopted in *Hubbard*. Minnesota law has long separated the two emotional distress torts, not recognizing one until 90 years after adopting the other. We see little basis for borrowing an element from one to add to the other, particularly when the zone of danger rule provides an indicia of genuineness the intentional tort requirements lack.

Our issue remains whether plaintiff has satisfied the physical injury or symptom requirement. This requirement is a judicial obstacle designed to insure a plaintiff's claim is real. *See* Restatement (Second) of Torts, § 436A, com. b. (1965). Our task is problematic for no clear line can be drawn between mental and physical injury. Comment, *Negligently Inflicted Mental Distress: The Case for an Independent Tort*, 59 Geo.L.J. 1237, 1241 (1971). Cases taking varying positions on what meets the physical injury requirement illustrate the difficulty. *See Bowman v. Williams*, 164 Md. 397, 404, 165 A. 182, 184 (1933) (weakness and nervousness sufficient physical symptoms); *Cosgrove v. Beymer*, 244 F.Supp. 824, 826 (D.Del.1965) (dizziness, mild headaches and nervousness insufficient symptoms of bodily harm). *See also Daley v. LaCroix*, 384 Mich. 4, 179 N.W.2d 390 (1970) (majority and dissenting views on what constitutes physical injury). The problem has lead some jurisdictions to abandon altogether the physical injury or symptom requirement which Minnesota continues to employ. *Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 928, 616 P.2d 813, 820, 167 Cal.Rptr. 831, 838 (1980); *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672, 679 (1979); *Leon v. Takasaki*, 55 Hawaii 398, 403, 520 P.2d 758, 767 (1974).

■ Although plaintiff's symptoms are less severe than those in *Okrina* and *Purcell*, we hold under the circumstances of this case that he has stated a prima facie case. The trial court upheld the jury's verdict finding that the "unique nature of the accident in this case [resolves] all doubts of the genuineness of the claim." This reasoning accords with Prosser's discussion of two types of cases allowing recovery for emotional distress without physical injury:

> What all of these cases appear to have in common is an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious. There may perhaps be other such cases. Where the guarantee can be found, and the mental distress is undoubtedly real and serious, there is no essential reason to deny recovery. But cases will obviously be rare in which "mental anguish," not so severe as to cause physical harm, will be so clearly a serious wrong worthy of redress, or sufficiently attested by the circumstances of the case.

Prosser, § 54, at 328.

This case does not fit in one of Prosser's recognized categories, but we believe the unusually disturbing experience plaintiff endured combined with his physical symptoms assure that his claim is real. There can be few experiences as terrifying as being pinned to a seat by gravity forces as an airplane twists and screams toward earth at just under the speed of sound. The nature of that experience guarantees plaintiff suffered severe emotional distress during the descent and the emergency detour to Detroit. This conclusion is supported by the suffering of many others who shared his experience. Plaintiff's recurring distress is no doubt genuine as well. His sweaty hands, elevated blood pressure and other signs of distress provide, in this case, sufficient physical symptoms to warrant the law's recognition of his claim. Therefore we hold that the law

permits recovery of damages for plaintiff's emotional distress.

### 2. Failure to Notify the Jury of Settlement

Following trial on TWA's and Boeing's liability, the trial court consolidated plaintiff's claim with three other plaintiffs for trial on damages. Boeing then negotiated a settlement with the four plaintiffs and executed a *Pierringer* release and settlement. Before trial TWA requested that the court notify the jury selected for the damages trial that Boeing had been a party to the lawsuit but had settled plaintiff's claims. TWA claims that the court's refusal to inform the jury prejudiced its case because the testimony of a Boeing metallurgist, Robert Davis, was introduced at trial.

TWA relies upon *Frey v. Snelgrove,* 269 N.W.2d 918 (Minn.1978). In *Frey* the supreme court set out guidelines for trial courts to follow when only one of multiple defendants settle. One guideline provides:

> Where the settlement and release agreement is executed during trial, the court should usually inform the jury that "there has been a settlement and release if for no other reason than to explain the settling tortfeasor's conspicuous absence from the court room."

*Id.* at 923, quoting from Simonett, *Release of Joint Tortfeasors: Use of the Pierringer Release in Minnesota,* 3 Wm. Mitchell L.Rev. 1, 30 (1977). While notifying the jury may be the best general practice, the decision lies within the trial court's discretion:

> The extent to which a settlement should be disclosed to the jury will vary from case to case and must rest in the *sound discretion* of the trial court. The goal, of course, must always be to preserve the remaining parties' right to a fair trial under the circumstances.

*Frey,* 269 N.W.2d at 922 (emphasis supplied).

TWA apparently claims introduction of Boeing's employee Davis' testimony without notifying the jury of Boeing's settlement caused it prejudice. We fail to see how TWA could have been prejudiced. Unlike the *Frey* case, the only issue at trial was plaintiff's damages. The comparative liability of the defendants had already been established. Further, Robert Davis' testimony was offered by way of a deposition taken months before the settlement. We require a more substantial showing of prejudice before ordering a new trial.

### 3. Evidence of Damage to the Airplane

TWA also claims that Robert Davis' testimony was irrelevant and prejudicial and should not have been admitted. Davis testified on the damages caused to the airplane and the cost of repairing it. Plaintiffs also introduced a videotape and photographs taken of the damaged airplane. Plaintiffs intended this evidence to indicate the severity of the force exerted on the passengers so the jury might better understand the experience and understand how other plaintiffs in the trial could have suffered physical injury.

Evidence which is both relevant and prejudicial should be admitted only after balancing the two under Minn.R.Evid. 403. A determination of this question is within the trial court's discretion. *Lines v. Ryan,* 272 N.W.2d 896, 902 (Minn.1978). Since we find the evidence on the condition of the airplane following the incident could assist the jury to understand the conditions its passengers experienced and we find any prejudice thereby caused to TWA speculative, we cannot conclude that the trial court abused its discretion.

### 4. Consolidation of the Plaintiff's Claims

TWA argues that plaintiff's claim for emotional distress should not have been consolidated with other plaintiffs' claims for both emotional distress and physical injury. TWA, however, failed to object to consolidation or to raise the alleged error in its post trial motions. Since a consolidation order is a matter involving trial procedure

we will review it only if specified as a ground for a new trial. *Antonson v. Ekvall,* 289 Minn. 536, 186 N.W.2d 187 (1971).

### 5. Exclusion of TWA's Expert Testimony

On November 23, 1983, the day before Thanksgiving and only five days before the date of trial, TWA served its statement of the case on plaintiff indicating its intent to call Dr. Walter Duffy, an expert on flying phobias. The morning of trial plaintiff moved to exclude Duffy's testimony because it was not timely disclosed. The trial court granted plaintiff's motion.

The trial court was assigned all Hennepin County District Court cases arising out of the TWA flight 841 incident. On December 14, 1982, the court notified all parties that they should disclose all expert witnesses by February 1, 1983. The notice informed the parties that failure to disclose would result in exclusion. Plaintiff did not serve expert interrogatories upon TWA.

TWA argues that the December 1982 order did not govern this trial, but instead governed only earlier trials on the liability issue. It also points out that numerous other pretrial matters were only completed by plaintiffs the morning of trial and that plaintiff never filed a statement of case. In sum, TWA complains it was treated unfairly, since the trial court gave special consideration to plaintiffs but handled TWA with uncompromising sternness. TWA also claims it did not retain Dr. Duffy until one week before trial, when settlement attempts failed. Apparently such expertise had not been needed in any earlier trials since plaintiff Abrahamson was the only plaintiff with a pure emotional distress claim.

■ When a party seeks to introduce expert testimony not previously noticed, determination of the appropriate remedy is within the trial court's discretion. *Phelps v. Blomberg Roseville Clinic,* 253 N.W.2d 390, 394 (Minn.1977); *In re Estate of Olsen,* 357 N.W.2d 407, 413 (Minn.Ct.App. 1984).

■ In this case we cannot find the trial court abused its discretion. It properly ordered early disclosure of witnesses and certain other evidence to enable it to effectively oversee the multiple and complex cases to be tried before it. While the terms of the order can be interpreted to apply only to the liability portion of the trial, it can also be interpreted to apply to all aspects of the trial. TWA cannot complain that it only realized its need for the expert testimony when, one week before trial, settlement attempts failed. Nor can it complain it was unfairly treated because plaintiffs indicated on the morning of the damages trial its intent to use certain evidence and exhibits when the record indicates those items were introduced in the earlier liability trial and were thus known to all parties and the court. Notwithstanding our refusal to order a new trial for abuse of discretion, allowing a continuance is the preferred solution for this problem. Exclusion is a harsh sanction which trial courts should use with restraint.

### 6. Plaintiff's Testimony as an Expert

■ TWA argues that plaintiff was allowed to testify as a medical expert even though TWA's own expert was precluded from testifying. Plaintiff, a doctor, was only allowed to testify that he examined medical literature for a psychiatric diagnosis. TWA's objections to questions asking if he had made a diagnosis were sustained by the trial court. Accordingly, plaintiff did not give an expert opinion and admission of his testimony does not entitle TWA to a new trial.

### 7. Improper Final Argument

TWA argues that plaintiff's attorney used improper arguments during his summation. TWA attacks three metaphors which counsel used in his attempt to describe plaintiff's emotional distress:

It occurred to me that when the Nazis chose to get information from someone, they didn't take his property away from him, they didn't put a cigarette out on

him, or they didn't charge him with electricity. All they did was shoot the man next to him. They never had to touch him. The ultimate mental anguish of knowing that your life is gone or almost gone, that's the power of mental anguish.

When you think of what happened to [plaintiff] on that plane knowing he was dead, is it any different than if someone is to take a gun and put a bullet in that gun and point it at the side of your head and pull the trigger, and that gun misfires, it goes click? Imagine that being done to you 40 times, 40 seconds, each time you are certain you are going to die. That's what mental anguish is. That's what happened on that airplane to those people, and they are remarkable people.

They remind me, the strength that they demonstrate on the witness stand, in some respect of the strength that we saw from our airmen that had been in prisoners of war camps in North Vietnam * * *

TWA also attacks a portion of counsel's summation where he asked the jury to consider the amount of money they would demand before agreeing to take a similar flight.

When a proper objection to closing argument is made, the determination of impropriety is within the trial court's discretion. *Bisbee v. Ruppert,* 306 Minn. 39, 47, 235 N.W.2d 364, 370 (1975). Normally prejudicial argument can be corrected by a curative instruction. *Id.* Accordingly, a request for a curative instruction is generally needed to establish a basis for requesting a new trial. *Id.* at 48, 235 N.W.2d at 370. In *Bisbee* the court said: "In the absence of such a request, we will not require a new trial despite the absence of specific curative instructions, for this is not the rare case where counsel's conduct is so egregious as to require the trial court to give curative instructions on its own motion." *Id.* at 48, 235 N.W.2d at 370–71 (footnote omitted). "A party is not permitted to remain silent, gamble on the outcome, and, having lost, then for the first time claim misconduct in opposing counsel's argument." *Patton v. Minneapolis Street Railway,* 247 Minn. 368, 375, 77 N.W.2d 433, 438 (1956).

We agree with TWA that counsel's closing argument was improper. In particular, the argument improperly suggests that the jury put itself in the place of plaintiff. *See Lamont v. Independent School District No. 395 of Waterville,* 278 Minn. 291, 295, 154 N.W.2d 188, 191–192 (1967). TWA, however, did not timely object to the closing argument nor request a curative instruction. We do not agree that the argument was so improper and prejudicial that the trial court abused its discretion by failing to intervene on its own motion to admonish counsel. Accordingly, we affirm the trial court's refusal to grant a new trial on this ground.

### DECISION

Plaintiff established a prima facie case of negligent infliction of emotional distress. Accordingly, the trial court properly denied defendant TWA's motion for judgment notwithstanding the verdict. The trial court properly denied TWA's motion for a new trial on the grounds discussed above.

Affirmed.