Roger D. W. RIEWE, et al.,
Respondents,

v.

Paul M. ARNESEN, M.D., Paul M. Arne-
sen, M.D., P.A., Marvin W. Dobson,
M.D., et al., Immanual-St. Joseph's
Hospital of Mankato, Inc., Mankato
Clinic, Ltd., et al., David A. Pope, M.D.,
et al., Defendants and Third Party
Plaintiffs, Respondents,

v.

Peter MUCHA, Jr., M.D., third party
defendant, Appellant.

No. C8–85–671.

Court of Appeals of Minnesota.

Feb. 4, 1986.
Review Denied March 27, 1986.

Robert J. Sheran, Lynn M. Anderson, Minneapolis, for Roger D.W. Riewe, et al.

James F. Roegge, Minneapolis, for Paul M. Arnesen, M.D., Paul M. Arnesen, M.D., P.A.

Kay N. Hunt, Minneapolis, for Marvin W. Dobson, M.D., et al.

Robert G. Johnson, Mankato, for Immanual-St. Joseph's Hosp. of Mankato, Inc.

C. Allen Dosland, New Ulm, for Mankato Clinic, Ltd., et al.

Jerome C. Briggs, Minneapolis, for David A. Pope, M.D., et al.

L. Joseph Genereux, Minneapolis, for Peter Mucha, Jr., M.D.

Heard, considered and decided by SEDGWICK, P.J., and LANSING and RANDALL, JJ.

## OPINION

SEDGWICK, Judge.

Dr. Peter Mucha appeals from a judgment and denial of his motion for a new trial. Roger and Juliane Riewe sued a group of Mankato physicians, their respective clinics and Immanuel-St. Joseph's Hospital for negligent treatment of an abdominal injury Roger Riewe received in a farming accident. The Mankato group sued Dr. Mucha for contribution and indemnity alleging that Riewe was negligently treated by Mucha after being transferred to Mayo Clinic.

Riewes settled with the Mankato group the day before trial and were not involved with any claim against Mucha. The trial was solely on the Mankato group's claim against Mucha.

The jury determined that Dr. Mucha and two of the Mankato doctors were negligent in treating Riewe and that each was the direct cause of the injuries. The jury

found Dr. Mucha 40% at fault and each of the Mankato doctors 30% at fault and that the settlement amount of $1,600,000 was reasonable. We affirm in part, reverse in part and remand for a new trial.

## FACTS

### A. The Accident.

Roger Riewe·was injured on March 20, 1981 when a cement wall fell against him and pinned him against a piece of farming machinery. He was transported to Immanuel-St. Joseph's Hospital in Mankato. At the time of the accident, Riewe was 32 years old.

### B. Admission and Treatment—Mankato.

At the hospital, Riewe was examined by Dr. Paul Arnesen, an orthopedic surgeon. Riewe's chief complaint was severe pain in the abdomen and pelvic area, particularly on the left side where X-rays revealed a fractured pelvis. Riewe also experienced pain on the right side, opposite the fracture site.

When the X-rays ruled out spinal damage, Arnesen concentrated on the possibility of abdominal complications. Arnesen was mainly concerned about on-going hemorrhage since urine tests had ruled out possible bladder damage. He agreed that the type of injury Riewe sustained could produce serious conditions, including peritonitis, an inflamation of the lining of the abdominal cavity. Since Arnesen did not feel qualified to diagnose intra-abdominal complications, he asked Dr. Mervin Dobson, a general surgeon, to examine Riewe.

Dobson examined Riewe on March 21st. As part of his examination of the abdominal area, Dobson tested for "rebound tenderness," an indicator of peritonitis, and bowel sounds, which are present if the bowel is functioning normally. Both tests were also conducted by Arnesen. Both doctors testified that a positive "rebound tenderness" test was a necessary symptom of peritonitis, a fact that was disputed at trial. Both tests performed by the doctors

were negative. They agreed on an initial diagnosis of an adynamic ileus—a nonfunctioning or temporarily paralyzed bowel stemming from trauma to the area, although neither ruled out the possibility of further injury to the abdominal area. Both doctors admitted that they did not perform a peritoneal lavage, a test used to detect on-going infection in the abdomen. Dr. John Perry, a general surgeon who developed the technique, testified at trial that the procedure was rather simplistic. Dobson concluded on March 21st that Riewe had a bruising of the abdominal wall but no serious internal injury.

Arnesen and Dobson continued to care for Riewe until March 24, 1981. Riewe's vital signs fluctuated during this period although his temperature gradually decreased. Arnesen testified that this cycle coincided with hemorrhaging muscles. A raspiness also developed in Riewe's breathing. According to the expert testimony, this symptom indicated a respiratory deterioration. Riewe's hospital records noted that his abdomen was increasingly "distended" and "firm."

Dobson contacted Dr. David Pope, a family practitioner, to take over Riewe's care while he was out of town. Pope examined Riewe on March 24, 1981 and concurred in the previous finding of no rebound tenderness. He was concerned that Riewe's respiratory condition indicated further abdominal problems. Pope consulted Dr. Rheinhardt Riessen, an internist, because Riewe's condition was deteriorating.

Riessen examined Riewe on March 26, 1981 and immediately placed him in intensive care. Riewe experienced episodes of confusion and complained of severe burning on his right side.

Riessen consulted Dr. J. Scott Sanders, a specialist in pulmonary diseases. Sanders examined Riewe on March 26th. After a number of tests, he made a tentative diagnosis of ARDS (adult respiratory distress syndrome), a finding common in cases of severe abdominal infection. Sanders utilized a cooling blanket to keep Riewe's temperature down.

Dr. Richard Meyer, a general surgeon, was also consulted on March 26th. Meyer testified that he found no "rebound tenderness" and only limited bowel sounds. He concluded that Riewe was not suffering from peritonitis since the rebound test was negative. Meyer believed a peritoneal lavage was unnecessary in light of these findings. A special blood test subsequently revealed intra-abdominal infection. A radiologist's report further indicated a thickened bowel wall, suggesting the presence of peritonitis. As a result of Riewe's rapidly deteriorating condition and the limited testing devices available, the doctors unanimously agreed to transfer Riewe to Mayo Clinic.

### C. Care and Treatment—Mayo Clinic.

Riewe was critically ill when transferred to Mayo Clinic on March 28th. Dr. Peter Mucha, a general surgeon, was on duty in the emergency room and took over Riewe's treatment. Mucha testified that he concentrated initially on Riewe's respiratory problem, since that was the primary basis of the Mankato referral. His immediate diagnosis was that the difficulty breathing was due to peritonitis. This caused severe distention of the abdomen and resulting pressure on the diaphragm. Mucha started a peritoneal lavage and immediately discovered "foul smelling" infected discharge in Riewe's abdomen. On the basis of these findings, urine tests, and x-rays, Mucha concluded that Riewe's condition was attributable to peritonitis and scheduled him for emergency surgery.

During surgery, Mucha discovered that 15–20 centimeters of the right portion of the small intestine were necrotic. His operative notes indicated that this was due to a torn sheath of blood vessels "obviously injured in the original accident." Mucha noted that the right side of Riewe's large intestine (colon) was also infected. This portion of the colon and the necrotic small bowel were removed.

Mucha performed a "primary anastomosis" in which the small and large intestines are joined at the point of healthy tissue. A second option, an "ileostomy", was also available to Mucha. In this procedure, the necrotic portion of the intestines is cut out, the end is brought to the surface of the abdomen and the fecal material drains outside the body. In the opinions of Dr. John Bond, a non-surgeon, Dobson, Meyer and Dr. Frederick Owens, a retired surgeon, an ileostomy was a proper and safer procedure under the circumstances because it better avoided the risk of ineffective stitching and spread of bacteria throughout the abdomen.

Mucha testified he performed a primary anastomosis based on a number of factors: the viability and health of the two ends of the bowels to be joined; the risks and difficulty of pulling the small bowel through Riewe's thick abdomen; the fact that the juncture was on the right side of the large intestine rather than on the left side; the desire to maintain maximum nutritional content in the intestinal tract; his training and experience with primary anastomosis rather than ileostomy; and the fact that he had experienced fewer complications in the former procedure.

Two other Mayo Clinic physicians corroborated Mucha's choice of a primary anastomosis. Dr. Oliver Beahres, a retired surgeon, and Dr. Michael Farnell, a colleague of Mucha's, agreed that this procedure had generally resulted in fewer complications at Mayo Clinic and was preferable in view of Riewe's obesity. Following surgery, Mucha told Mrs. Riewe that her husband had a "four out of five chance that he was going to die in spite of our operation." Riewe's condition appeared to improve for a few days after the surgery and then deteriorated.

Farnell conducted a second surgery on April 1, 1981, and found two major problems: first, a leak in the primary anastomosis that Mucha had performed, and second, a hole in the sigmoid colon which the surgeons believed to be the source of the infection. Mucha testified that this hole did not exist at the time of the first surgery. Farnell performed an ileostomy since the bowel was inflamed and unable to

hold stitches. Complications arose after the second surgery and Riewe was operated on five more times over the next two weeks. Farnell attributed the subsequent surgeries to Riewe's advanced state of peritonitis, although he agreed that the two leaks partially contributed to the need for the surgery. In the opinion of Dr. Owens, Riewe could have been relieved of most, if not all, of the 50 subsequent surgeries performed if Mucha had utilized the alternate ileostomy procedure. The experts sharply disagreed over the duration of the peritonitis. Dr. Louis Weiland, a pathologist, was not permitted to offer his opinion on this subject.

Based on the jury's special verdict, the trial court found the Mankato group entitled to $640,000 contribution from Mucha.

## ISSUES

1. Did the trial court err in ruling that respondents, not their insurers, were the real parties in interest when settlement was accomplished through "loan receipt agreements?"

2. Did the trial court err in refusing to allow cross-examination of respondents and their expert witnesses on the basis of their agreements with their malpractice insurers?

3. Did the trial court err in preventing a pathologist from testifying to the length of time peritonitis existed in the patient's abdomen?

4. Did the trial court err in permitting a gastroenterologist, a non-surgeon, to testify about surgical procedures performed by appellant?

## ANALYSIS

■ 1. Minn.R.Civ.P. 17.01 states that "[e]very action shall be prosecuted in the name of the real party in interest." The purpose of this rule is to protect defendants from facing multiple suits on the same claim by requiring that a party's interest be such that a final decision will bar subsequent suits. *Independent School District No. 14 v. AMPRO, Corp.,* 361 N.W.2d 138,

144 (Minn.Ct.App.1985), *pet. for rev. denied,* (Minn. March 29, 1985). If this purpose is satisfied, the rule is similarly satisfied. *Norby v. Bankers Life Co.,* 304 Minn. 464, 467, 231 N.W.2d 665, 668 (1975) (citation omitted). A determination of the real parties in interest to a lawsuit is ordinarily a question of fact for the trial court, whose findings must be upheld unless clearly erroneous. *Minnesota Education Association v. Independent School District No. 404,* 287 N.W.2d 666, 668 (Minn. 1980) (citations omitted).

At issue in the present case are various loan receipt agreements between respondents and their respective insurers. Respondents Meyer and Mankato Clinic, Ltd. received $300,000 from their insurer, Minnesota Medical Insurance Exchange. The remaining respondents, insured by St. Paul Fire & Marine Company (St. Paul Companies), each received an undetermined percentage of $700,000. All of the agreements utilized the following language:

RECEIVED * * * as a loan repayable only to the extent of any net recovery I may make from any person or persons or corporation or corporations on account of that certain incident involving acts of negligence occurring on or about the 28th day of March, 1981, and the negligent treatment thereafter * * *.

As security for such repayment, I hereby pledge to said [insurer] the said recovery against said person or persons, corporation or corporations, and I agree to enter and prosecute suit against such person or persons, corporation or corporations, on account of said negligence with all due diligence, at the sole expense and under the exclusive direction and control of said [insurer].

Appellant claims that this method of settlement was used to avoid joinder of insurers as the real parties in interest. We disagree. The trial court properly relied on *Blair v. Espeland,* 231 Minn. 444, 43 N.W.2d 274 (1950), to resolve this issue.

In *Blair,* a contribution action, the supreme court held money furnished under the loan receipt agreement was evidence of

a valid loan and not a "payment" by the insurer. Since the money was not a payment, subrogation did not arise. The court recognized that the loan receipt agreement allowed the insurer to benefit from a recovery while remaining "hidden from view," but stated:

> We see no reason why defendant should be concerned with the arrangement between insured and insurer. A judgment in this case against him would be a protection against another suit by plaintiff's insurer, as plaintiff is the party in legal interest. The arrangement between plaintiff and his insurer cannot affect defendant financially. Therefore, he need not be concerned. There is no danger of more than one recovery. There seems, therefore, to be no legal basis for defendant's objections to the "loan receipt" agreement. Where defendant is not legally affected, he cannot interfere with the freedom of plaintiff and his insurer to contract, through the device of a "loan receipt" agreement, * * *.

*Id.* at 449–50, 43 N.W.2d at 277–78.

█ Under *Blair*, it is clear that the trial court here properly determined that respondents were the real parties in interest.

2. Appellant argues that the trial court's refusal to allow meaningful cross-examination of witnesses on bias or prejudice resulting from loan receipt agreements and their relationships to their insurers was prejudicial error. During a bench conference at the outset of the trial, the trial court stated its intention to exclude any evidence concerning insurance:

> So we don't get into this again, I want all counsel to tell their witnesses that they are not to mention insurance company * * * I don't want any of that * * *. I don't want to get any insurance company involved in this case.

Despite this, trial counsel initiated questioning into the reasonableness of the individual respondents' portions of the settlement on several occasions. This inquiry was consistently disallowed by the trial court, many times after lengthy bench discussions.

Appellant relies primarily on *Pacific Indemnity Co. v. Thompson-Yeager, Inc.*, 260 N.W.2d 548 (Minn.1977). *Pacific Indemnity* was a consolidated action by shopping center tenants against multiple defendants for fire damage to their respective properties. After the jury was impaneled but before testimony was taken, the plaintiffs agreed to limit the liability of two defendants and to dismiss their claim against them in exchange for payment of a specified amount plus dismissal of various cross-claims and third-party claims. The defendants were to remain in the litigation and the respective sums were to be repaid if the jury determined that either defendant was not liable. The terms of the agreement, reduced to writing, were fully disclosed to the court during an in camera hearing.

Finding the agreement closely akin to a "loan receipt agreement" the court discussed at length whether such an agreement prejudiced the remaining defendants:

> The greatest difficulty caused by pretrial settlement agreements is their effect on the adversary nature of the litigation. This fact was recognized by the court in *Reese v. Chicago, Burlington & Quincy R. Co.*, [55 Ill.2d 356, 303 N.E.2d 382 (1973)]. The court said:
>
> > Defendant * * * argues that the use of loan agreements tends to undermine the adversary nature and integrity of the proceedings against the remaining defendant. To a limited extent, we agree. It seems not unlikely that, where a defendant has executed a loan-receipt agreement with a plaintiff who thereupon dismisses that defendant and proceeds against the remaining ones, the employees and witnesses of the dismissed defendant may be substantially more cooperative with plaintiff than would otherwise be true, since any recovery by that defendant of the loaned amount is frequently contingent upon plaintiff's success against the remaining defendants. *To some*

*degree the same may be said of many third-party actions. But we believe adequate protection for those defendants exists if by cross-examination they are permitted to establish that a witness knows of the existence of a loan agreement, and, if so, that the witness may be biased or prejudiced as a result thereof.* 55 Ill.2d 364, 303 N.E.2d 387.

*Pacific Indemnity,* 260 N.W.2d at 557 (emphasis supplied). Reaffirming its displeasure at "secret settlements" and the resulting prejudice, the court continued:

*Disclosure and an adequate opportunity to cross-examine insure that the adversary process is not so subverted as to deny a fair trial.* In the instant case the agreement was disclosed to the court and counsel before the jury heard any testimony, and arguments made regarding the discoverability of the agreement seem inapposite. Additionally, counsel for [defendant] Yale *fully argued the effect of the agreement on the adversary position of the other parties to the jury, without objection.*

*Id.* at 557 (emphasis supplied).

The *Pacific Indemnity* court ultimately held that the agreement did not have a prejudicial impact on the outcome of the trial. We think that *Pacific Indemnity* is virtually on all fours with the present case. Although that case involved the original parties to the lawsuit and not solely a third-party action, we do not find this dispositive. The *Pacific Indemnity* court was clearly concerned with the impact of pre-trial settlements on remaining defendants. Affording the opportunity for effective cross-examination was a means to accomplish the end, ensuring a fair trial. We take particular note that the *Reese* case, quoted at length in *Pacific Indemnity,* involved a loan receipt arrangement. Here, the trial court refused to allow any cross-examination that would disclose the insurers' involvement. The effect of this blanket prohibition was prejudicial. Moreover, we find no support for the trial court's reliance on

Minn.R.Evid. 411 as a basis for its decision. Stated in full, the rule provides:

Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. The rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, *or bias or prejudice of a witness.* (Emphasis supplied).

■ Respondents claim that no prejudice resulted since appellant was allowed to cross-examine the Riewes and their former attorneys about the reasonableness of the settlement. They further claim that inquiry into their respective shares of the settlement was irrelevant since the special verdict focused solely on the reasonableness of the settlement as a whole. This argument begs the question. Since appellant was not allowed to elicit any information on cross-examination that would expose the insurers' roles, he was not afforded *meaningful* cross-examination. Under *Pacific Indemnity,* appellant was entitled to establish the existence of the loan receipt agreements and to examine respondents for bias or prejudice resulting from those agreements. Similarly, he is entitled to elicit respondents' respective shares of the settlement as a means of establishing bias.

■ The same considerations compel the conclusion that the trial court erred when it disallowed questioning of respondents' witnesses, Dr. Bond and Dr. Owens about their connection with St. Paul Companies, their insurer. We also note that Dr. Owens was a minor shareholder in the company. The trial court stated in its memorandum:

The jury was aware that each party had their own medical witnesses and that each party had access to medical witnesses which were not called to testify. The court is satisfied that the jury had enough sophistication to realize that a party would pick and choose so that a witness favorable to it was obtained for

trial. The evidence also revealed to the jury that medical witnesses were paid for their testimony. .

It is doubtful (at least on the showing made by defendant) that a jury would seriously question the credibility of a medical witness because that witness was a policyholder, one among many, or a stockholder, with few shares among many shares. The problem is no different than having a jury of taxpayers sit on a case involving their city or county. The interest is so diffused that little effect would be given to it.

The impact of these factors on the doctors' credibility was an issue for the jury, not the court. *See Conroy v. Kleinman Realty Co.*, 288 Minn. 61, 66, 179 N.W.2d 162, 165–66 (1970). We are mindful that this case presents a basic conflict between the public policy favoring settlement and the inherent right to meaningful cross-examination. Neither interest is served however, by a blanket prohibition against disclosure of insurance when such a disclosure is relevant to proving bias or prejudice of a witness.

There are several Illinois cases that followed *Reese* in which the admissibility of loan receipt agreements is discussed. In *Casson v. Nash*, 74 Ill.2d 164, 23 Ill.Dec. 571, 384 N.E.2d 365 (1978), it was established that such an agreement may not be used for impeachment where the bias of the witness is already evident, and that its admission under such circumstances would be reversible error. The *Casson* court said:

> The relevant principle that emerges from *Reese* is that when a witness whose interest in the outcome of the case is not apparent to the jury may be influenced by the existence of a loan-receipt agreement, the jury may properly consider the effect of the agreement on the credibility of that witness.

*Id.* at 169, 384 N.E.2d at 367.

■ The purpose of admitting evidence of the loan agreement at trial is to allow the non-settling defendant to expose the dismissed defendant's bias against him and

in favor of the plaintiff. Where the extent of witness bias is obvious to the trier of fact, the trial court may properly rule that the evidence of the loan agreement is inadmissible. *Webb v. Toncay*, 102 Ill.App.3d 78, 82–83, 57 Ill.Dec. 757, 761, 429 N.E.2d 874, 878 (1981) (*citing Harris Trust and Savings Bank v. Ali*, 100 Ill.App.3d 1, 9, 425 N.E.2d 1359, 1365–66 (1981) ).

Where the witness sought to be impeached by showing an agreement with a third person is one of the present parties, the question of admissibility is more debatable. This is because the danger that the evidence will be used substantively as an admission is greater. Also, as the party's interest is apparent, the need for additional evidence on credibility is less. *Kenny v. Lakewood Engineering and Manufacturing Co.*, 85 Ill.App.3d 790, 796–97, 41 Ill. Dec. 53, 58, 407 N.E.2d 551, 556 (1979) (quoting McCormick, Evidence § 274 at 665 (2d ed. 1972) ). We can find no case where plaintiff has been completely compensated and only defendants and a third party defendant remain.

■ The bottom line in all of these cases is whether potential bias or prejudice of a witness, or, less frequently a party, is apparent to the jury. Applying this criterion to the present facts, we find the exclusion of the loan agrements for impeachment purposes of the defendant Mankato doctors, and the refusal to permit cross examination of the two expert witnesses for the Mankato group, Drs. Bond and Owens, to be prejudicial error.

Here, the plaintiffs have been fully compensated and are no longer in the case. The most obvious form of bias, that between an injured plaintiff and a defendant doctor is thus removed from the jury's consideration. What remains is a third party action between the Mankato doctors and Dr. Mucha.

The Mankato doctors' settlement was completely paid for by their insurance carriers on condition they pursue a claim against Mucha "with all due diligence, at the sole expense and under the exclusive

direction and control * * * of their insurers."

Because the insurers were contractually obligated to defend their clients and indemnify them to the extent of the policy limits if malpractice was proved, what do defendants gain by prosecuting the claim against Mucha on behalf of the insurers? The jury has the right to ascertain what bias, gain, or intimidation, if any, motivates defendants in this lawsuit.

Dr. Bond is insured by St. Paul Companies and Dr. Owen is apparently a shareholder therein. Minn.R.Evid. 411 permits cross examination on their relationship with their insurer, or why it was necessary for them to agree to prosecute this action in return for the settlement proceeds.

In *Palmer v. Avco Distributing Corp.*, 82 Ill.2d 211, 45 Ill.Dec. 377, 412 N.E.2d 959 (1980), the Illinois court noted, with approval, that the trial court had received the entire loan agreement into evidence, stating: "Full revelation also seems preferable to permitting jury speculation about an agreement's precise terms." *Id.* at 226, 45 Ill.Dec. at 385, 412 N.E.2d at 967. The *Palmer* court noted the necessity of a cautionary jury instruction when receiving the agreements. The type of loan agreement in *Palmer* was significantly different than the agreement in the present case and required an instruction tailored to its facts. In the instant case it is sufficient for the trial court, on remand, to instruct the jury to consider the loan agreement only as bearing upon witness credibility.

■ 3. Whether to permit the use of expert testimony, even on short notice, is within the trial court's discretion. *Newmaster v. Mahmood*, 361 N.W.2d 130, 133, (Minn.Ct.App.1985) (citation omitted). Trial courts are in the best position to assess the degree of prejudice that will arise from a violation of the discovery rules and the appropriate sanction for this violation. *Cornfeldt v. Tongen*, 262 N.W.2d 684, 697 (Minn.1977).

> When the failure to disclose is not willful, the trial court should consider alternative methods short of exclusion *for preventing prejudice*, e.g., granting a continuance and assessing costs against the offending party, *Krech v. Erdman*, 305 Minn. 215, 218, 233 N.W.2d 555, 557 (1975); or *limiting the subject matter of the testimony to matters already disclosed*, *Phelps v. Blomberg Roseville Clinic*, 253 N.W.2d 390 (Minn. 1977).

*Newmaster v. Mahmood*, 361 N.W.2d at 133 (emphasis supplied).

Respondents contend that exclusion was proper since appellant failed to disclose in his answer to interrogatories that Dr. Weiland would testify as an expert and offer his opinion on the standard of care. The following witness description was provided by appellant two weeks before trial as required by the trial court's order:

> Dr. Weiland, a surgical pathologist, is expected to testify as to the analysis of tissue removed from Roger Riewe during the course of surgery at Mayo Clinic.

Respondents did not object to Weiland's opinion that peritonitis existed during the surgery nor to his use of pathological slides to explain his testimony. When asked for his opinion on the length of time peritonitis existed, however, respondents objected. Appellant then made an offer of proof:

> [Dr. Weiland] would testify based on his analysis of the slides or analysis of the tissue that peritonitis at the time of Dr. Mucha's operation was six to eight days old.

The trial court sustained the objection on the ground that "the [witness] summary does not reveal a crucial opinion."

In *Newmaster*, the plaintiffs informed the defendants two months before trial that they had retained a licensed consulting psychologist and vocational expert to "evaluate the economic impact of [plaintiff's] injuries" at trial. The description did not mention that the psychologist's testimony would be based in part on the results of an MMPI psychological test. The information was not furnished to defense counsel until the afternoon before the trial. The trial

court allowed the testimony and this court affirmed, stating:

> Although it undoubtedly would have been better practice to submit the summation of [the psychologist's] proposed testimony to the appellants earlier, *there is nothing in the record which indicates that failure to disclose was intended to take advantage or cause prejudice to the opposing party by surprise testimony.*

*Id.* at 134.

In *Ford v. Chicago, Milwaukee, St. Paul & Pacific Railroad,* 294 N.W.2d 844 (Minn. 1980), the court similarly upheld the admission of an expert's testimony even though the plaintiffs knew of the expert's findings and failed to disclose this to defendants. In both *Newmaster* and *Ford,* the appellants had failed to seek a continuance.

In *Krech v. Erdman,* 305 Minn. 215, 233 N.W.2d 555 (1975), the court upheld the trial court's admission of a neurologist's testimony, although disclosure was not made until the day before trial. Additionally, the neurologist was one of only two experts to testify that the plaintiff received permanent injuries. Again, the appellant did not seek a continuance.

> Trial courts have a duty to suppress such evidence where counsel's dereliction is inexcusable and results in disadvantage to his opponent. In situations where the failure to disclose is inadvertent but harmful, the court should be quick to grant a continuance and assess costs against the party who has been at fault.

*Id.* at 218, 233 N.W.2d at 557.

In *Phelps v. Blomberg Roseville Clinic,* 253 N.W.2d 390 (Minn.1977), the trial court allowed plaintiffs to substitute an expert witness after the trial had begun but restricted the testimony to matters previously disclosed to defendants. The supreme court affirmed, holding that the defendants had not met their burden of demonstrating that the trial court's discretionary ruling resulted in prejudice to their case. *Id.* at 394.

In *Lane v. Skyline Family Medical Center,* 363 N.W.2d 318 (Minn.Ct.App.1985),

the trial court permitted the testimony of a treating physician, although disclosure of the witness was made only five days prior to trial. The court deferred to the trial court's discretion, finding neither party at fault for the absence of earlier disclosure.

■ These cases consistently provide that exclusion of an expert's testimony is a harsh measure reserved for those situations where the failure to disclose is willful and clearly prejudicial to the opposing side. We find no merit to respondents' contention that Dr. Weiland was unqualified to testify as an "expert." His *proffered* testimony directly related to appellant's comparative fault. If Weiland had been allowed to testify, the jury could have concluded that appellant's negligence was less than the 40% apportioned. Although a more detailed witness description would have been desirable, we think it implausible that respondents were "unfairly surprised" by the proffered testimony. Respondents did not object to Weiland's opinion that peritonitis existed *during* the surgery. Given this, it is difficult to understand how respondents could be unfairly surprised when the testimony included the length of time the infection had been present prior to surgery.

Moreover, as the trial court noted, "[t]he most crucial factual issue was the time peritonitis started." Drs. Eisenberg, Perry, Farnell and appellant himself all testified that the peritonitis existed six to eight days prior to the surgery. Drs. Bond and Owens testified that the symptoms were not apparent anywhere from three days to six hours before appellant's surgery. All of these medical opinions were based on diagnostic techniques and not pathological studies, the basis of Dr. Weiland's opinion. The trial court found this distinction prejudicial to respondents.

> In the court's opinion [Dr. Weiland's] testimony would have had a substantial impact on the jury because the opinion was tied to something specific, tissue cells from the body of the patient. The witness's testimony as to the use of elec-

tronic microscopes to examine the cells and the preparation of the samples for microscopic examination created an aura of scientific certainty when compared with the clinical techniques used by other medical experts.

■ It is precisely for this reason that Dr. Weiland's testimony should have been admitted. Appellant was entitled to have testimony bearing on a crucial issue in the case before the jury. Furthermore, we disagree with the trial court's conclusion that a continuance was inappropriate.

The jury had spent the better part of a month listening to medical experts, viewing charts, etc. To allow this testimony would have seriously prejudiced [respondents]. To recess the trial to give [respondents] an opportunity to obtain a pathologist and to give him time to analyze tissue samples would have impaired the jury's ability to retain, weigh and analyze the complicated medical evidence and result in prejudice to one or other of the parties. See *Quill v. Trans World Airlines, Inc.*, [361 N.W.2d 438 (Minn.Ct. App.1985), *pet. for rev. denied*, (Minn. April 18, 1985.)]

The *Quill* case relied on by the trial court involved untimely disclosure of an expert witness in violation of a court order. *Quill* is thus distinguishable on its facts.

The Minnesota Supreme Court has stated:

All admissible evidence ought to be received in order that the triers of fact may determine the outcome in justice to both sides as nearly as can be. * * * Where the case is close on the facts the rejection of competent and material evidence is reversible error.

*Kellett v. Wasnie*, 261 Minn. 440, 450, 112 N.W.2d 820, 826 (1962) (citations omitted).

Here, the record discloses that twice during the trial, respondents had to interview witnesses due to appellant's apparent failure to make sufficient disclosure. While we are not unsympathetic to respondents' position, we do not believe that these incidents dispose of the issue at hand. The trial, starting on November 16th, was inter-

rupted several times because of the Thanksgiving holiday, the court's special term calendar and previous commitments by the attorneys. Although four weeks had elapsed when Weiland testified on December 12th, only nine actual trial days had occurred. The jury was thus, well-accustomed to interruptions of the proceedings. The record disclosed that respondents had access to a pathologist in Mankato. We cannot understand, given these circumstances, how a brief continuance would have prejudiced respondents when such a crucial issue was at stake. Exclusion of this testimony under the circumstances was too drastic a remedy. *See Dennie v. Metropolitan Medical Center*, 369 N.W.2d 552 (Minn.Ct.App.1985).

4. In *Jones v. Fleischhacker*, 325 N.W.2d 633, 640 (Minn.1982), the court stated:

It has now become axiomatic in this state that the sufficiency of the foundation to qualify a witness as an expert is a question left almost entirely to the trial court and we will not reverse unless it is clearly apparent that the trial court was wrong.

(quoting *Teslow v. Minneapolis-Honeywell Regulator Co.*, 273 Minn. 309, 312, 141 N.W.2d 507, 509 (1966)); *see Hudson v. Snyder Body Inc.*, 326 N.W.2d 149, 155 (Minn.1982). Determination of this issue necessarily involves incorporation of Minn. R.Evid. 702 which states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Appellant claims the trial court's failure to limit Dr. Bond's testimony to matters within his area of expertise was reversible error. We disagree.

In *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn.1977), the supreme court held that a medical expert must possess both scientific

**459**

knowledge of, and practical experience with, the subject matter of the testimony offered. The court noted:

> [The medical expert] must have had basic education and professional training as a general foundation for his testimony, but it is a *practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify* to the degree of care against which the treatment given is to be measured.

*Id.* at 692–93 (quoting *Pearce v. Linde,* 113 Cal.App.2d 627, 629, 248 P.2d 506, 508 (1952)) (emphasis supplied). *See Reinhardt v. Colton,* 337 N.W.2d 88, 93 (Minn. 1983).

Dr. Bond has impressive credentials. His specialty, gastroenterology, deals specifically with diseases of the abdomen, digestive system and liver. He has practiced this specialty for 14 years. For the last seven years, he has been employed as chief of gastroenterology at the Minneapolis VA hospital, where he encounters patients with problems similar to Riewe's. He also teaches gastroenterology at the University of Minnesota. In the last eight years, Dr. Bond's primary research focused on blood flow to the intestinal tract and the effects of interruptions. Although Bond is not a surgeon, he often functions as a diagnostician during surgical procedures and discusses the type of surgery to be performed.

> [O]pinion evidence is not restricted to the testimony of the person best qualified to give an opinion or even to some of the few persons best qualified. One may be competent to testify as an expert although he is not shown to be highly qualified to speak upon the subject or is not at the top of his profession. It is usually held that any person whose profession or vocation deals with the subject at hand is entitled to be heard as an expert, while the value of his evidence is to be tested by cross-examination and ultimately determined by the jury.

*Haas v. Gaviser,* 348 N.W.2d 406, 408 (Minn.Ct.App.1984) (quoting *Christy v. Saliterman,* 288 Minn. 144, 167, 179 N.W.2d 288, 303 (1970)).

In its memorandum, the trial court stated:

> Dr. Bond's general medical training and his day-to-day work with surgeons over a long period of time, his many observations of surgery, his participation with surgeons in the assessment of surgical needs of patients and types and methods of surgical procedures to be applied, and his knowledge of surgical standards was more than adequate to qualify him as a specialist in the surgical field involved in this case. His actual performance of surgery is not necessary to qualify him to testify in this area.

We agree with the trial court. Dr. Bond's testimony was properly admitted.

We find no error in the trial court's denial of a change of venue because of the circumstances created by the last minute settlement of plaintiff's claim. However, since none of the reasons advanced by the trial court for its denial will be present upon remand, the appropriate statutory provisions must be applied. *See* Minn.Stat. §§ 542.09–542.11 (1982).

### DECISION

Although the trial court properly determined that respondents, and not their insurers, were the real parties in interest under loan receipt agreements, total prohibition against disclosure of insurance was reversible error since it prevented meaningful cross-examination into witness' bias or prejudice. The trial court erred when it prevented a pathologist from stating his opinion on a crucial issue in the case absent a showing that a continuance would clearly prejudice respondents. The trial court properly allowed a gastroenterologist and non-surgeon to testify on the surgery performed by appellant when his educational background and practical experience qualified him as an expert. On remand, the trial court must reconsider whether a

change of venue is proper since appellant is now the sole defendant in the case and resides in the county where respondents' asserted cause of action arose.

Affirmed in part, reversed in part and remanded for a new trial.